TOWN OF NEW HAVEN *v.* E. S. WESTON, WILLIAM MCINTYRE,
AND NATIONAL BANK OF MIDDLEBURY.

May Term, 1912.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 20, 1913.

*Towns—Powers Granted — Officers — Authority — Selectmen —
Treasurer—Unauthorized Payment of Town Orders—Acceptance of Benefits—Ratification of Acts of Treasurer—
Right to Orders Not Delivered — Injunction — Crossbill —
Relief.*

Towns are mere creatures of the Legislature, constituted for governmental purposes, and possess only such powers as are expressly
granted, or are implied because necessary to carry into effect such
as are expressly granted.

Municipal officers derive their authority largely, if not wholly, from
the law, and not from the municipality, and all persons dealing
with them are bound to know the extent and limitation of that
authority.

Where for years a town treasurer had an arrangement with a bank whereby he would pay town orders with cash or by checks on his personal account with the bank and then deliver the accepted orders to the bank, where they would be credited to his personal account and held by the bank as outstanding obligations of the town, and he would also deposit town funds to the credit of that account and draw checks on it in payment of valid obligations of the town, and the orders so held by the bank would be retired as fast as that account permitted, and by that method of doing business the bank, on the treasurer's death, held unpaid town orders that had been credited to the treasurer's account, and that account was then largely overdrawn in payment of valid obligations of the town, as the town had received, and still retained, the benefit of the money advanced on those orders, it cannot deny the bank compensation for the actual value received and represented by the orders, and so a court of equity will not enjoin the bank in respect of those orders, as they are at least evidence of the amount of money received for the benefit of the town.

A town treasurer has no authority, merely by virtue of his office, to borrow money for the use of the town.

The selectmen of a town are its prudential officers and have authority to borrow money for its use, or to authorize the town treasurer to do so in their stead, or ratify his acts in that behalf.

Ratification may be made by the principal or his duly authorized agent.

Where a town treasurer, without authority, borrowed money for the use of the town and gave interest-bearing receipts therefor, the action of the selectmen in taking up the receipts and issuing town orders in lieu thereof is a ratification of the loans binding on the town, where it does not appear but that the selectmen were satisfied that the town had the benefit of the loans.

Equity regards that as done which ought to be done, and so where for years a town treasurer had an arrangement with a bank whereby he would pay town orders with cash or by checks on his personal account with the bank and then deliver the accepted orders to the bank, where they would be credited to his personal account and held by the bank as outstanding obligations of the town, and he would also deposit town funds to the credit of that account and draw checks on it in payment of valid obligations of the town, town orders found among the private papers of the treasurer

after his death, covering the amount that he had overdrawn his account, belong to the bank.

In a suit in equity by a town to restrain a bank from enforcing town orders held by it, where the bank files a crossbill to compel the town to deliver to the bank town orders that the town treasurer, under his agreement with the bank, should have delivered to it, and which were found after his death among his private papers, no decree will be made in respect of these orders, it not appearing that the town ever had possession of them, and the representative of the treasurer not being a party to the suit.

APPEAL IN CHANCERY. Heard on the pleadings and master's report, at the December Term, 1910, Addison County, *Stanton*, Chancellor. Decree for the orator. The defendants appealed. The opinion states the case.

*George E. Lawrence, E. G. Hunt* and *Leroy Russell* for the orator.

*Charles I. Button* and *Marvelle C. Webber* for the defendants.

POWERS, J. For more than fifteen years prior to his death on May 19, 1909, Alfred P. Roscoe was treasurer of the town of New Haven. During all or part of this time he was town clerk, postmaster, trustee of public money, treasurer of a local church society, treasurer of the county agricultural society, and handled and invested some of the funds of Beeman Academy. He carried on a fire insurance business, and acted as a banker for his neighbors, issuing and cashing checks for their convenience. He kept an account at the Middlebury National Bank in his own name, and to the credit of this account he deposited money coming to his hands from these various sources, except such as he received as postmaster and treasurer of the agricultural society. Against this account he drew his personal checks in payment of such bills as he was called upon to pay, including personal obligations and debts against the town. He issued accommodation checks against this account in exchange for cash, and either deposited the cash so received to the credit of the account, used it to pay his own bills, or to redeem town

orders, as occasion required. When town orders were presented to him in the regular course of town business, after requiring the holder to write his name across the backs of them, he would either give the holder the amount called for in cash or his personal check drawn against this account in the bank. Later on, he would take the orders, or a part of them, write the word "accepted" on the backs of them, sign his name as treasurer thereunder, and from time to time send them to the bank to be credited to his said account as outstanding obligations of the town. These acceptances were dated as of the day they were forwarded to the bank, but the orders generally came to his hands some time before. Sometimes, orders were presented directly to the bank; these were cashed by the bank, charged to Roscoe's account, and sent to him for acceptance. When received by Roscoe he would indorse his acceptance thereon and return them to the bank; and they were then credited to Roscoe's account like the others. At the time of his death, the amount of orders held by the bank was $2,201.29, and his account was overdrawn $344.55. About the time that Roscoe became treasurer of the town, the selectmen made arrangements with the bank to provide the money for the payment of the town's state taxes at a special rate of five per cent. interest, and in consideration thereof the bank was to have the town's business. It was the practice of the selectmen to issue town orders for the amount of the state highway and school taxes. These were drawn to Roscoe and he put them in the bank and thereby raised the money for the payment of these taxes. None of these orders were in the bank at the time of Roscoe's death. While the bank held town orders, it charged interest thereon until the condition of Roscoe's account was such that they or some of them could be taken care of, when they would be charged up and retired.

The foregoing method of handling the town business was according to an arrangement entered into between Roscoe and the cashier of the bank, and had existed for at least ten years prior to the former's death.

During his last sickness, Roscoe directed a member of his family to forward some of these orders to the bank for deposit, but on one occasion, at least, the orders were not sent as directed. After his death, orders amounting to $329.19 were found among his papers, and checks drawn and paid during this

illness correspond with these orders, indicating that he had taken up the orders with checks and laid them aside to be forwarded and deposited according to the usual course.  Except as stated, no arrangement was made between the selectmen and Roscoe, or between the selectmen and the bank, as to how the business should be conducted; nor was there any evidence that the selectmen knew the method or details of any of the transactions between Roscoe and the bank.  They had, however, for a good many years, drawn orders to themselves for the amount of their salaries, some of which were paid by Roscoe's personal checks. No vote of the town was ever passed regarding borrowing money for the use of the town.

The accounts of the treasurer and other town officers were audited annually, and a report was published and distributed purporting to show the standing of the town finances, and the contents of these reports was known to the selectmen.  From the time of the March meeting until the taxes were paid in the fall the selectmen drew orders for the current expenses of the town.  Taxes were payable to the treasurer, and the selectmen knew that they were not paid in large amounts until about the first of September, and that orders were drawn by them between March and September in excess of the money in the treasury. They also knew that Roscoe took care of such orders in some way.  The reports of the auditors published as aforesaid, were annually accepted by vote of the town, and ordered to be filed and recorded; and while Roscoe had been behind in his accounts for ten years, the auditors did not discover it, but reported his accounts to be correct.

No town orders remained in the bank on October 7, 1908. All had been previously paid, and Roscoe's account then showed a credit balance of $330.99.  Between that date and the date of Roscoe's death, May 19, 1909, he deposited orders amounting to $2,001.29, and during the same time, the bank cashed his checks drawn for the payment of valid obligations of the town to the amount of $3,882.48.  And during the time specified no other town funds went into his account.  So, treating all of the money left in his account on October 7 as belonging to the town, the town has, since that date, actually been benefited by this method of doing business, $1,550.20.

An examination of Roscoe's books discloses certain irregularities and errors covering his entire term of office. Some of these, the master says, are clearly clerical errors; others, he says, are difficult to understand. Some are in his favor; some are against him. The net result, however, is a shortage, but the amount is disputed and we find no occasion for determining it.

After the defendant Weston was appointed town treasurer, the selectmen discovered that the treasury was empty; and in order that the new treasurer might have money in hand, they drew an order for $500, which was cashed by the bank. Weston then began paying orders when presented, and paid orders held by the bank at the time of Roscoe's death to the amount (including interest) of $1,029.77, leaving orders amounting to $1,171.52 in the bank. The legal agent of the town, Mr. Hunt, advised Weston that these orders were invalid, and protested against their payment; but Weston maintained that it was his duty as treasurer to pay orders so far as he had funds, and informed Hunt that he should continue to do so.

The town brings this bill in chancery to restrain the collection or payment of the outstanding orders hereinbefore and hereinafter specified and to compel the holders to surrender the same, and to require the bank to pay back the $1,029.77 received from Weston. The bank, by way of crossbill seeks to compel the town to deliver to it the orders amounting to $329.19 set apart by Roscoe as stated.

Three groups of town orders are involved: 1. Those deposited by Roscoe. 2. Those issued to retire the McIntyre receipts as hereinafter stated. 3. Those amounting to $329.19 found among Roscoe's papers after his death. A fourth class might have been made of those presented directly to the bank, but there is no way of identifying them, and so they cannot be separately considered.

1. In the argument before us regarding the validity of the orders deposited by Roscoe, counsel have made the character and legal effect of the transactions between Roscoe and the holders of the orders the test of the town's liability to the bank. The claim of the town is that these transactions were, in law, payments, and that the well established rule ''once paid, always paid'' applies to them, and therefore they cannot be enforced. The bank's claim is that, in view of its arrangement with Ros-

coe, the transactions amounted to purchases of the orders by Roscoe for the bank.

In our view this question is not controlling. Let us assume that the orders were, in law, paid when Roscoe took them up. Roscoe undertook to make an agreement for the town whereby he was to procure money for the town's use by depositing these orders as he did. As between Roscoe and the bank, Roscoe, in effect, either bought the orders for the bank, or, in effect, he borrowed money for the use of the town. Whatever the character of the arrangement was, the bank has fully carried it out. The town has had the benefit of it. It proposes to retain this benefit, which as we have seen amounts to at least $1,550, so far as the dealings are here concerned. In other words, the town now repudiates Roscoe's authority to make an agreement, under which it has, in effect, received and retains over fifteen hundred dollars of the bank's money. The injustice of such a result must be apparent to everybody.

It should be remembered that we are not dealing with a contract which a town is forbidden by law to make, nor yet with one which a town is unauthorized to make for itself, nor are we dealing with a contract wholly executory. We have here a contract fully executed on the part of the bank, the benefits of which are retained by the town,—a contract which is (we will assume) unenforceable, but only because made with an officer who had no authority to make it. In short, a loan under a contract with an unauthorized agent, the avails of which have gone to pay the valid debts of the principal.

Between individuals, on plainest principles, the law would require repayment of this money. It remains to consider whether a municipal corporation can avoid this result.

We approach the discussion of the law of this subject with these general principles established: Towns are mere creatures of the Legislature constituted for governmental purposes, *Burlington* v. *C. V. Ry. Co.,* 82 Vt. 5, 71 Atl. 826; *Sargent* v. *Clark,* 83 Vt. 523, 77 Atl. 337, and possess only such powers as are expressly granted or are implied because necessary to carry into effect such as are expressly granted. *Swanton* v. *Highgate,* 81 Vt. 152, 69 Atl. 667, 16 L. R. A. (N. S.) 867. Like all corporations, both public and private, they necessarily act through agents; but municipal officers derive their authority, largely, if

not wholly, from the law and not from the municipality, and all persons dealing with them are bound to know the extent and limitations thereof. *Taft* v. *Pittsford,* 28 Vt. 286; *Barre* v. *Perry & Scribner,* 82 Vt. 301, 73 Atl. 574. There is a marked tendency, however, on the part of the courts to treat these public corporations, in their ordinary business affairs, more nearly as private corporations and individuals are treated than was formerly done. And while there are some who hold that the contract of an unauthorized municipal officer is void and cannot be enforced and gives rise to no available equities no matter how unjust the result, there is plenty of authority for the more reasonable and just rule that where the infirmity in the contract lies merely in the lack of authority of the one who assumes to make it for the municipality, and the latter has received and retains the benefit of the contract, the law will not refuse relief to the other party, at least to the extent of the benefit conferred. This last clause is added for the reason that, as will be seen from the cases following, courts which arrive at practically the same result, differ in this one respect. Some say that the municipality is estopped to deny the validity of the contract; others say that the contract as made is invalid, but one who has carried it out may recover, not on the contract, but *quantum meruit* or *quantum valebant.* In other words, some, in effect, make the contract binding; others, in effect, make it binding to the extent of benefits received and retained by the municipality.

*Argentini* v. *San Francisco,* 16 Cal. 255, is a leading case on the subject under discussion. Two opinions appear in the report of the case. COPE, J., expressed the view that, while an executory contract made without authority cannot be enforced, in the case of a contract which had been executed, the benefit of which the municipality has received, the law interposes an estoppel, and will not permit the validity of the contract to be questioned. FIELD, Ch. J., took this view: "If the city obtain the money of another by mistake or without authority of law, it is her duty to refund it,—not from any contract entered into by her on the subject, but from the general obligation to do justice, which binds all persons whether natural or artificial,"— though he says the rule does not apply where money or property was received in disregard of a positive prohibition.

*East St. Louis* v. *East St. Louis Gaslight and Coke Co.*, 98 Ill. 415, 38 Am. Rep. 97, involved the validity of a long term contract for lighting the streets of the city. The city had authority to contract for service of this character, but it was claimed that a thirty year term was beyond its authority and that the contract as made would result in exceeding the debt limit fixed by the charter. The court left the question regarding the term undecided, but applied the rule governing private corporations and held that, at least so far as executed, the contract was binding; that the light having been furnished and enjoyed by the city, it ought to be paid for.

In *Des Moines* v. *Welsbach Street Lighting Co.*, 188 Fed. 906, 110 C. C. A. 540, it is said, "The complaint made of the contract in question is not that it was one beyond the scope and power of the city to enter into, but that it was not entered into in the manner prescribed by law. A business contract which is within the scope of the powers of the city to make, but illegal because entered into in an irregular manner, when fully executed by one party and the city has received and accepted the full benefit of the contract and cannot restore what it has received, is enforceable, the city being estopped to assert the irregular execution when the ends of justice would be thereby defeated."

In *Schneider* v. *Manasha*, 118. Wis. 298, 95 N. W. 94, 99 Am. St. Rep. 996, the rule is thus stated: "The result is, no one can successfully plead ignorance to save himself from loss in dealing with a municipality as to matters expressly prohibited, nor as to any matter beyond the scope of corporate authority except in case his money or property has actually been used for legitimate corporate purposes. In that event, on equitable grounds, the court will afford a remedy to the extent of the corporate benefit, but no further."

It is held in Alabama that where a city's contract is illegal because it is prohibited it is utterly void and the city is not in any wise bound, though it has used the money received thereunder. But where the contract is merely unauthorized, and the money or property has been received by the city and applied to its authorized objects, it is liable to an action of implied assumpsit. That while no suit can be maintained on the contract, "persons who have in any way advanced money to a corporation, which money has been devoted to the necessaries of the

corporation, are considered in chancery (and at law in the equitable action for money had and received) as creditors of the corporation to the extent to which the loan has been so expended.'' *Bluthenthal* v. *Headland,* 132 Ala. 249, 31 South. 87, 90 Am. St. Rep. 904; *Allen* v. *LaFayette,* 89 Ala. 641, 8 South. 30, 9 L. R. A. 497; *Ensley* v. *Hollingsworth & Co.,* 170 Ala. 396, 54 South. 95, 25 Ann. Cas. 652.

The same distinction is made in Pennsylvania and it is held that municipalities must account for money or other property applied by their officers to authorized uses, although it was received under an agreement that is wholly unenforceable. *Aspinwall-Delafield Co.* v. *Aspinwall,* (Pa.) 77 Atl. 1098; *Rainsburg* v. *Fyan,* (Pa.) 4 L. R. A. 336; *Long* v. *Lemoyne,* 222 Pa. 311, 71 Atl. 211, 21 L. R. A. (N. S.) 474.

*Valley Falls Co.* v. *Taft,* (R. I.) 61 Atl. 41, involved the validity of a contract to construct a highway on payment of certain advances which were made. It was argued on behalf of the town that the council had no power to bind the town as they assumed to do. ''If this is so,'' said the court, ''the money was paid without consideration, and may be recovered back.''

In *Eden* v. *Stevens,* (Ia.) 138 N. W. 927, a town treasurer had deposited the public funds in a private bank. The bank failed and the funds were tied up. In this situation of affairs, the treasurer voluntarily paid certain warrants with his own money, expecting to be reimbursed when the public funds should become available. The court held that he was entitled to a recovery, saying: ''It would be a reproach to the law if there were no remedy available to the defendant under such circumstances. We can think of no fair reason, either legal, equitable or moral, why he should not be reimbursed.''

See also *Bell* v. *Kirkland,* 102 Minn. 213, 113 N. W. 271, 13 L. R. A. (N. S.) 793, 120 Am. St. Rep. 621; *First Nat. Bank* v. *Goodhue,* (Minn.) 139 N. W. 599; *Nebraska Betulithic Co.* v. *Omaha,* 84 Neb. 375, 121 N. W. 443; *Fort Scott* v. *Eads Brokerage Co.,* 117 Fed. 51, 54 C. C. A. 437; 1 Beach Pub. Corp. §226; 2 Hermann Estop. §1222; 1 Abb. Mun. Corp. 579-581.

In *Hitchcock* v. *Galveston,* 96 U. S. 341, 24 L. ed. 659, a contract for street work payable in bonds was under discussion. The right of the city to make such a contract was denied. But

it was held that the validity of the provision regarding payment was not controlling: "If," said the court, "payments cannot be made in bonds because their issue is *ultra vires,* it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law." And in *Chapman* v. *County Comrs.,* 107 U. S. 348, 27 L. ed. 378, 2 Sup. Ct. 62, not only was this proposition affirmed but the following language from *Pimental* v. *San Francisco,* 21 Cal. 362, was approved: "The city is not exempted from the common obligation to do justice which binds individuals. Such obligations rest upon all persons, whether natural or artificial. If the city obtains the money of another by mistake or without authority of law, it is her duty to refund it, from this general obligation. If she obtains other property which does not belong to her, it is her duty to restore it, or, if used, to render an equivalent therefor, from the like obligation. *Argentini* v. *San Francisco,* 16 Cal. 282. The legal liability springs from the moral duty to make restitution."

And it is this very doctrine, we think, which underlies our own cases, *Burnham* v. *Stafford,* 53 Vt. 610, and *Brock* v. *Bruce,* 59 Vt. 313, 10 Atl. 93. In the former, the plaintiff, being one of the selectmen, borrowed a sum of money of a certain person and gave therefor a town order to which he signed his own name and the names of the other selectmen. He claimed that he paid the money over to the town treasurer. The town denied his right to sign the names of the other selectmen, and denied that the treasurer ever received the money, and refused to pay the order. Thereupon the plaintiff went to the holder of the order and took it up, and brought suit against the town declaring in general assumpsit. It was held that he could not recover on the order, as it was not negotiable in form; nor could he recover on the ground that it was paid at the request of the town, since he knew when he took it up that the town had repudiated it; but that, in the circumstances, if he could prove that he turned the money over to the town treasurer and it was received for the town, he could recover, for it would be "a loan directly from the plaintiff to the town—money had and received of him by the town to its use—for the payment of which the law would imply a promise."

In the Brock case, the prudential committee of a school district borrowed a sum of money on the credit of the district and

used it for the purposes of the district, and assessed a tax large enough to cover it. It was claimed that the committee had no authority to borrow this sum. But it was said that the money was needed and used for paying the expenses of the school, and if the committee had no authority to borrow it on the credit of the district, it might be treated as if they borrowed it of themselves; and it being to supply a temporary need in respect of expenses for which a tax might legally be assessed under the vote, it was properly a part of these expenses, and ought to be so regarded."

See, also, *State* v. *St. Johnsbury,* 59 Vt. 332, 10 Atl. 531.

It is especially appropriate that the rule of restitution should be applied when a municipality, while holding benefits which it does not offer to surrender, applies for relief, against the enforcement of alleged illegal warrants or orders, to the court of chancery, wherein the maxim is "He who seeks equity must do equity." To permit this town to deny the bank the right to compensation for actual value received, would be manifestly inequitable and unjust, and would amount to an utter disregard of the maxim. *Turner* v. *Cruzen,* 70 Ia. 202, 30 N. W. 483; *Natchez* v. *Mallery,* 54 Miss. 499; *Grand Isle Gas Co.* v. *West,* 28 Neb. 852, 45 N. W. 242.

So we need not assert the legality or illegality of the orders deposited by Roscoe. If they are valid, of course their collection will not be enjoined. If they are invalid, they correctly represent the amount advanced by the bank, and can be used as evidence. There is no danger to the town in their remaining in the hands of the bank and an injunction is unnecessary and should not be granted. *Allen* v. *LaFayette, supra.*

2. Roscoe had another method of procuring money. He borrowed various sums from different persons in the community, giving as evidence thereof a writing, signed by himself as treasurer, reciting that he had received a certain sum of the person named, "for the use of the town, payable on demand, with interest annually." When he had money of the town, Roscoe would call in these receipts and pay the holder the amount specified with interest. This practice he had followed for a number of years. These transactions did not appear in the reports, but he charged in his account each year a considerable sum as interest in excess of that paid to the bank. Soon after Roscoe's

death, the defendant McIntyre presented to the selectmen receipts of the kind described, issued between December 1, 1908, and February 1, 1909, to the amount (including interest) of $1,642.24, and asked for orders in exchange therefor. He asked for two orders; one for $1,500, and one for $142.24. After some discussion, these were issued to him by the selectmen and he surrendered the receipts. The larger of these orders, McIntyre deposited in the defendant bank in his check account and soon after checked out most of it. The other he holds. These receipts did not appear on the books as an outstanding liability, and it did not appear before the master that the town ever received the money on them. McIntyre was one of the auditors and assisted in the audit of the town books in February, 1909, and at that time the books showed a substantial balance on hand in all departments. He said nothing about his receipts, though it is not found that he intentionally concealed the fact that he had them. He had let Roscoe have money for his own use, taking his personal note therefor, and held one such note when Roscoe died. The selectmen knew nothing about this method of raising funds.

It is apparent that these orders differ from those hereinbefore discussed in a vital particular,—they do not represent money which it is found went to the town's use. So if these are to be held valid when issued, it must be on the ground that a town treasurer has *ex-officio* authority to borrow money for the town, in which case it would make no difference whether the town actually received the money or not; or on the ground that the action of the selectmen in issuing orders to take up the receipts bound the town by way of ratification.

That a town treasurer has no authority by virtue of his office merely to borrow money for the use of the town seems clear enough. His duty is to receive and keep the money of the town, *Middlebury* v. *Rood*, 7 Vt. 125, and to pay it out on proper orders, or otherwise account for the same. Certain special duties are put upon him by statute, but his fiscal duties are limited as stated. The selectmen, however, are officers of more general authority. They are commonly spoken of as the "fathers of the town," and by express enactment have general supervision of the affairs of the town, and are to cause duties required of the town, not committed to any particular

officer to be duly performed and executed. P. S. 3467. See *Middlebury* v. *Rood, supra.* They are especially the financial agents of the town. *Thayer* v. *Lyman,* 35 Vt. 646; *Burnham* v. *Strafford,* 53 Vt. 610. They are to audit and in their discretion allow claims against the town for money paid or services performed, and draw orders therefor. P. S. 3471. They may submit disputed claims to arbitration, and the award will bind the town. *Dix* v. *Dummerston,* 19 Vt. 262; *Hollister* v. *Pawlet,* 43 Vt. 425. They may, in certain cases, employ counsel, *Burton* v. *Norwich,* 34 Vt. 345, settle cases in which the town is interested, *Cabot* v. *Britt,* 36 Vt. 349, and control by contract an invalid tax-bill. *Miles* v. *Albany,* 59 Vt. 79, 7 Atl. 601. Their authority approximates that of general agents. It was said by Chief Judge POLAND in *Cabot* v. *Britt,* that "selectmen cannot be said to be, in a strict legal sense, general agents of towns, because specific subjects and duties, committed by law to other officers, do not belong to them. Nor are we prepared to say that in other respects they are general agents of towns to such an extent as to be authorized to exercise all the corporate authority of the town, and by their action bind the town in all cases where the town itself could by a corporate vote. But in all matters pertaining to the ordinary and usual corporate interest, we think it was intended by the statute to clothe selectmen with authority to act without calling a town meeting to act upon it." It follows, we think, that the selectmen are authorized by law to borrow money, from time to time, as the necessities of the town require. No one denies that they have authority to continue to draw orders for the payment of town debts, and thereby make the town liable on such orders, though to their knowledge the treasury is empty. Such orders, on due presentment, would bear interest at the legal rate. It would be a misfortune if they should be held to be unauthorized to borrow money to pay current bills, and issue the order to the lender instead of the creditor, and thereby secure to the town the lower rate of interest which can always be obtained. It is a matter of common knowledge that towns are usually out of funds between spring and fall. During this time the usual bills for roads, schools and the poor must be met. It is altogether reasonable and quite consistent for this court to hold that the selectmen may pledge the credit of the town for money borrowed to

meet its current bills,—without a vote of the town on the subject.

If they could borrow money for the town, the selectmen could authorize the treasurer to do so in their stead or ratify his acts in that behalf. For the rule is that ratification may be by the principal or his authorized agent. 1 Dill. Mun. Corp. (2 ed.) § 387; *Clark* v. *Lyon Co.*, 8 Nev. 188; *People* v. *Swift*, 31 Cal. 28. This is shown by our own cases. In *Langdon* v. *Castleton*, 30 Vt. 285, the plaintiff continued to serve the defendant as attorney after his office of town agent expired, without an express contract with the town or the new agent. It was held that he could recover for his services, for the agent must have known about the matter and it was taken that he assented.

*Topsham* v. *Rogers*, 42 Vt. 189, arose under a statute which made it unlawful for liquor agents to purchase liquors for their agencies, and imposed that duty upon the selectmen. Not regarding this provision, and in spite of a contract to like effect, the defendant bought liquors for his agency, used the town funds to pay for them, sold them in violation of law, and refused to account for the proceeds. It was held that these acts were unwarranted, and that the town might repudiate them; but that the selectmen might have made the defendant their special agent to buy the liquors for the town, and had an undoubted right to adopt and ratify the transaction after the acts were done.

See, also, *Mt. Holly* v. *Buswell*, 45 Vt. 354; *Hett* v. *Portsmouth*, (N. H.) 61 Atl. 596.

These receipts might or might not have been valid against the town. There was no fraud perpetrated on the selectmen, and they chose to treat them as valid. Exercising that discretion which the statute vests in them, they allowed the claims made by McIntyre for the money represented by the receipts. "If the right surrendered," said this court in *Gregg* v. *Weathersfield*, 55 Vt. 385, "is of doubtful validity, or indeed of no validity at all, its surrender may be a valuable consideration for a promise." What the result would be had the McIntyre receipts been of acknowledged invalidity and his claim wholly invalid, we need not say. It did not appear before the master that the money went to the use of the town; but it does not appear, nor can we assume, that it did not appear to the satis-

faction of the selectmen that the town had the benefit of the loans. In the circumstances the claim was within their jurisdiction to allow or disallow.

3. In equity the orders which Roscoe had laid aside to be sent to the bank belong to the bank. Equity regards that as done which ought to be done, and so what is agreed to be done, *Beardsley* v. *Knight*, 10 Vt. 185, 33 Am. Dec. 193. When Roscoe drew his checks for these orders and laid them aside to be forwarded to the bank pursuant to the arrangement, he held them as a quasi-trustee for the bank, and when the bank paid the checks, it became entitled to the orders. But it does not here appear that these orders ever passed into the control of the town. Roscoe's representative is not a party here, and it only appears that these orders were found among his papers. They are not necessary to a recovery of the amount paid by the bank and it not appearing that the town is in a position to make delivery of them, no decree regarding them should be made. *Angus* v. *Robinson*, 62 Vt. 60, 19 Atl. 993.

*Decree reversed and cause remanded with directions to dismiss the bill with costs.*