**FIDELITY & DEPOSIT CO. OF MARYLAND v. ABERDEEN NAT. BANK & TRUST CO.**

No. 11984.

Circuit Court of Appeals, Eighth Circuit.

Jan. 19, 1942.

Clark R. Fletcher, of Minneapolis, Minn. (Donald West, of Minneapolis, Minn., R. F. Williamson, of Aberdeen, S. D., and Fletcher, Dorsey, Barker, Colman & Barber, of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN and JOHNSEN, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

The Fidelity and Deposit Company of Maryland appeals from the judgment dismissing with prejudice the above-entitled action and awarding costs and disbursements to the appellee. The parties will be referred to as in the trial court.

The plaintiff is engaged in the business of writing fidelity and surety bonds. The defendant is a national bank located at Aberdeen, South Dakota. Since January 10, 1927, one Marie Brown had been Treasurer of the City of Aberdeen, and since February 8, 1927, Treasurer of the School District of this City. The defendant bank was one of the official depositaries for the City and the School District funds. The bank account for the City funds was maintained under the name of "Marie Brown, City Treasurer." The School fund account was designated "Board of Education, Marie Brown, Treasurer," or similar designation.

On September 2, 1936, Marie Brown confessed that she had embezzled funds of the City, and an investigation disclosed that she had stolen $160,878.74 in cash from the City over a long period of years. These funds consisted of cash paid to her as City Treasurer by various concerns and persons who owed money to the City and which money was never deposited by her in any bank. The investigation further disclosed that, during her term in office, she diverted School funds to the City account and diverted City funds to the School account through the accounts maintained in the depositary banks, including the defendant. The total of the School District moneys diverted to the City during her term in office amounted to $910,951.86, and the total of City funds diverted to the School District amounted to $848,399.71. At the time her peculations were brought to light, the total diversions from the School District to the City exceeded the diversions the other way by $62,552.15. On September 2, 1936, the net cash shortage in her account as City Treasurer was $98,326.59, and the net shortage in her account as School

Hugh Agor, of Aberdeen, S. D. (Lester T. Van Slyke and Earl B. Harkin, both of Aberdeen, S. D., and Ralph O. Barnett, of Baltimore, Md., on the brief), for appellant.

Treasurer was $60,730.13. Apparently, the School District account had received $1,822.02 from a source undisclosed, thereby reducing to that extent the School shortage. It may be noted that there was no cash abstracted from the School funds. The shortage in that account was occasioned solely by diversions of funds to the account of the City.

Plaintiff was surety on the official bond of the City Treasurer from May 21, 1930, to May 21, 1931, in the sum of $300,000, and in the amount of $100,000 from May 21, 1931, to May 21, 1932. This $100,000 bond was continued in force from year to year until May 21, 1937. Plaintiff was also one of the sureties on the official bond of Marie Brown as Treasurer of the School District for the period July 1, 1932, to July 1, 1935, and from July 1, 1935, to July 1, 1938. The School Treasurer's bond was in the sum of $25,000, of which amount the plaintiff was surety for $20,000. After plaintiff had obtained full knowledge as to all the facts and circumstances with reference to Marie Brown's shortage and the nature and extent thereof, it paid to the City the sum of $98,326.59. This sum was the exact difference between the sum of $160,878.74, the cash embezzled, and the sum of $62,552.15, which latter sum was the net amount of School moneys diverted by Marie Brown to the City; that is, the accounting disclosed that the City's cash loss was decreased by $62,552.15, in that this sum was the net amount of School funds diverted to the City and which had been used by the City for its legitimate purposes. Plaintiff's claim as subrogee of the City against the defendant bank is based upon diversions of City funds to the School account aggregating $72,018.56. These diversions occurred during the last six weeks of Marie Brown's term as Treasurer, and may be listed as follows:

County warrant No. 2137 payable to "Marie Brown, Treasurer of the City or Town of Aberdeen," dated July 25, 1936, in the sum of $22,291.12, which was endorsed by Marie Brown in writing, "Marie Brown, Treasurer"; county treasurer's check No. 1208 payable to "Marie Brown, City Treasurer," dated July 25, 1936, in the sum of $36,402.87, which was endorsed by Marie Brown in writing, "Marie Brown, Treasurer"; county treasurer's check No. 1209 payable to "Marie Brown, City Treasurer," dated July 25, 1936, in the sum of $6.66, which was endorsed in writing, "Marie Brown, Treasurer"; county treasurer's check No. 1210 payable to "Marie Brown, City Treasurer," dated July 25, 1936, in the amount of $1,096.45, which was endorsed by Marie Brown in writing, "Marie Brown, Treasurer"; county warrant No. 2142 payable to "Marie Brown, Treasurer of the City or Town in said County," dated August 14, 1936, in the sum of $2,462.43, which was endorsed by Marie Brown with a rubber endorsement stamp, "City of Aberdeen, Marie Brown, City Treasurer"; county warrant No. 2141 payable to "Marie Brown, Treasurer of the City or Town in said County," dated August 14, 1936, in the amount of $9,759.03, which was endorsed by Marie Brown with a rubber endorsement stamp, "City of Aberdeen, Marie Brown, City Treasurer."

These warrants and checks were issued for the purpose of paying certain moneys due the City from the County. They were deposited by Marie Brown with the defendant bank for collection and credit to the account of the School District with that bank. It appears that the proceeds of these checks and warrants were used to pay bona fide obligations of the School District, except some $11,071.09, which apparently was restored to the City. The net amount, therefore, which plaintiff seeks to recover is $60,947.47. That the bank acted in good faith in crediting these sums to the School account and that at no time did it have any actual knowledge of the Treasurer's defalcations is conceded. It is the plaintiff's position, however, that, in that the City Treasurer was required by law to deposit all City funds in the City account, the bank was bound to know the extent of, and limitations upon, the powers of the City Treasurer, and that, therefore, a conversion took place of the six warrants and checks referred to when they were credited to the School District's account. While many questions are raised on this appeal, the vital and fundamental question presented is whether the City actually suffered any damage as the result of any of the six diversions which are the basis of this action.

As the result of the diversions from the School account to the City account just prior to the six transactions complained of, the excess diversions from the School to the City account amounted to $123,499.62. This sum was reduced to $62,552.15 by reason of the six diversions now in suit. Both parties hereto apparently recognize the rule of quasi contracts that, where A

steals B's money, and with this money·confers a benefit upon C, B is entitled to recover his money from C unless C is an innocent holder for value. Ætna Casualty & Surety Co. v. Local Building & Loan Ass'n, 1933, 162 Okl. 141, 19 P.2d 612, 84 A.L.R. 526. Unquestionably, the $123,499.62 of the School funds diverted to the City's account was used by the City for legitimate and bona fide City purposes. If the City was obliged to make restitution to the School District of the diversions made to it from the School District funds, the return of the $60,947.47 in the six transactions referred to merely resulted in the restoration of funds due the School District from the City, and no damage has resulted. The query, therefore, arises as to whether the City had any right to retain the School District funds which were wrongfully diverted to it and which funds were used by the City for proper and legitimate purposes. Presumably, if we were considering a single transaction where, by reason of error or even ulterior purposes, moneys were diverted from the School District to the City, the law would impose a quasi-contractual obligation upon the City to make restitution to the School District for school tax money so received and used by the City for legitimate purposes under a mistake of fact. Plaintiff contends, however, that the application of this rule to the circumstances herein would be improper because the City was not benefited by the diversion of the School money to it, and it relies, among other cases, on Craft v. South Boston Railway Company, 1889, 150 Mass. 207, 22 N.E. 920, 5 L.R.A. 641, and Independent Consolidated School District of Dow City v.· Crawford County Trust & Savings Bank, 1941, 230 Iowa 657, 298 N. W. 667. These cases generally support the principle that, if the City's use of the money diverted to it concealed the shortage and enabled Marie Brown to embezzle additional amounts, the City did not benefit by its use of the School money and that no resulting obligation to refund such money would arise.

In the Craft case, 150 Mass. at pages 208, 209, 210, 22 N.E. at page 920, 5 L.R. A. 641, the facts as stated by the court were as follows:

"William Reed was treasurer of the defendant, and also a broker. As broker, he sold bonds for the plaintiff, and sent to her his personal check for the proceeds, amounting to $2,575, and at the same time wrote to her as follows: 'If you wish to loan this on call, can lend it to South Boston Railroad Company at five per cent. interest, and you can have it at any time at one day's notice.' The plaintiff thereupon called upon Reed, and said that she would lend $2,500 to the defendant, and she gave back to him his check, and two days later received by mail, from Reed, the note in suit. Interest was paid on the note at three different times, for six months each, by Reed, by his individual check. The plaintiff believed that everything was right and honest on the part of Reed, and that he had authority to make the loan, and give the note in question, as binding on the defendant. She was ignorant of any by-laws of the defendant, and made no inquiries about them. The note is for $2,500, on demand, after date, payable to the order of the plaintiff, and is signed, 'South Boston Railroad Co., By Wm. Reed, Treas.' * * *

"It is plain that Reed had not authority, in fact, to borrow this money for the company, and to give its promissory note. * * *

"Reed's testimony was that he had embezzled large sums of money from the defendant, and that 'he could not tell what debts of defendant he had paid out of the $2,500 received from the plaintiff, and that he had used it to cover up and conceal his shortage to the defendant, but that he used it to pay the debts of the defendant.'"

In stating its reasons for denying recovery to the plaintiff, the court made this observation (150 Mass. at page 210, 22 N.E. at page 921, 5 L.R.A. 641): "No obligation on the part of the defendant ought to be implied in this case because Reed was a defaulter, and the money was used to cover up his defalcation by paying debts of the company which the money of the company, if he had not embezzled it, would have been used to pay. The only reasonable inference is that Reed's primary purpose in using the money in this way was to escape detection, and benefit himself. Whether it was a benefit to the company that he was able to obtain and use money for this purpose is necessarily uncertain."

It will be noted that, in Newell v. Hadley, 1910, 206 Mass. 335, 92 N.E. 507, 29 L.R.A.,N.S., 908, the court explained and elaborated upon its decision in Craft v. South Boston Railway Company by the following (206 Mass. at page 344, 92 N,E. at page 511, 29 L.R.A.,N.S.,·908):

"It appears from the original papers in that case that the money there in question was borrowed by the defaulter in January, 1885, and used at that time in covering up his defalcations by paying some of the defendant's debts. It was not until November, 1886 (a year and nine months later), that his defalcations were discovered. Reed, the defaulter, testified that 'for some time before giving the note, and at that time, and so continuing until November, 1886, he had taken large sums of the defendant's money and appropriated them to his own personal use, all of which he had concealed from the defendant's officers until November, 1886, when his embezzlements were discovered.' In other words, the use of the plaintiff's money in paying the defendant's debts in that case had resulted in enabling the defaulter to steal more money from the defendant, and what this court meant when it said, 'Whether it was a benefit to the company that he was able to obtain and use money for this purpose is necessarily uncertain,' was that this plaintiff had failed to prove that the transaction as a whole had resulted in a benefit to the defendant when the payment of the defendant's debts with the plaintiff's money had enabled the defaulter to steal more money than was so paid."

The teachings of the Craft case and the other decisions relied upon by the plaintiff are based on the view that the use of the money, in this case the School District money, constitutes in reality a detriment to the City because the diversions enabled the defaulter to continue the embezzlement scheme. This principle necessarily presumes that the shortages were concealed by reason of the diversions. The trial court herein found that the City's use of the School District funds did not enable Marie Brown to conceal her shortage, and in that the funds were used for legitimate City purposes, the municipality was thereby benefited. At the outset, it must be emphasized that the shortage in the City's funds was occasioned by the pilfering of the cash drawer. No funds were abstracted or came into Marie Brown's personal possession by reason of the diversion of checks and warrants from one account to another. Manifestly, if the shortage was not a concealed shortage, the diversions were not the proximate cause of any damage which the City may have sustained. In other words, if, during this period, the shortage was open and apparent to any competent auditor upon inspection of the books, records and available data, it cannot be characterized as concealed. If the use of the School District funds was not the cause of the failure to discover the embezzlement, the prima facie benefit which the City admittedly obtained has not been rebutted. Not only did the trial court find that there was no concealed shortage, but it further found that, if the County Auditor, Board of Commissioners of the City, the School Clerk, or the members of the Board of Education, had not been palpably negligent in performing, or failing to perform, their duties, the shortage would have been promptly exposed. That there is substantial evidence to sustain these findings is reasonably free from doubt. True, the negligence of the City and County officials is no defense to any negligence of the bank employees, but their laxity is relevant if it establishes that, in fact, the shortages were never concealed. It may be conceded that Marie Brown was motivated in making the diversions for the purpose of escaping detection and avoiding overdrafts. However, wrongful diversions cannot be characterized as the cause of a concealment which in fact did not exist. In keeping her accounts, she did not record in her City books the receipt of School moneys from time to time diverted to the City account. Consequently, any comparison of her actual deposits in the bank and her entered book deposits as City Treasurer would have instantly disclosed that she was depositing money in her City account which did not come from sources recorded in her books. The City Treasurer's books were audited at irregular periods, usually every year, and at no time at any one of these audit cutoff dates did the diversions from the School funds equal the amount of her cash embezzlements. This is strikingly illustrated by reference to Exhibit 47, a summary prepared for the trial. This exhibit discloses the following, in part:

| "Cutoff Date | | "Known Excess of Embezzlements over Diversions |
|---|---|---|
| December | 31, 1926 | $ 2,530.52 |
| February | 9, 1929 | 11,114.14 |
| May | 8, 1930 | 10,298.11 |
| May | 6, 1931 | 20,043.49 |
| June | 20, 1932 | 7,438.97 |
| July | 10, 1933 | 36,035.56 |
| September | 30, 1934 | 37,293.32 |
| May | 27, 1935 | 32,687.77 |
| May | 31, 1936 | 48,753.94 |
| June | 9, 1936 | 52,569.49" |

This tabulation or summary reflects that the known shortages varied from $2,530.52 to $52,569.49 over and above the diversions at the respective dates indicated. One may very pointedly inquire, how did this evident deficiency escape detection? That there were many irregular and false entries in the books is undoubtedly true, but detection would have inevitably followed if a simple comparison between her bank statements and her book entries had been made. Then, again, there were various acts of nonfeasance by officials which undoubtedly contributed to the failure to discover her fraudulent practices. For instance, on July 10, 1933, the State Examiner gave her credit for having $27,236.59 more in the bank than she actually had. She simply entered that sum in her books as a deposit in the bank, and without more, the examiner accepted her entry as reflecting an actual deposit in that sum. Other similar examples might be cited. Double credits were given by the examiner for certain items. Credits were claimed by her for items in transit without any more proof than her assertion to the examiner, when the truth of the matter was that she had no transit items. No attempt was made to verify her bare assertions. She was given credit for items on hand when she was not yet charged with such particular items, and for which sums, therefore, she should not have been credited. Such items varied from $2,530.52 to $15,148.86. Substantial sums would be received by her as City Treasurer and she would delay a month or more before their receipt was reported. There are instances where the County Treasurer furnished her with duplicate checks around audit dates in 1933 and 1934, enabling her to deposit the duplicate and to show the original to the examiners. Advances were made by the same official in sums as high as $59,000 before warrants were issued for the amounts due.

With respect to the School District account, similar carelessness and incompetence of auditors and officials was disclosed by the evidence. In 1932, she was given credit for having $133,524.98 on hand in the office, and of that sum, $43,928.72 was funds of the City and not of the School District. The evidence disclosed that the items were represented by a certificate of deposit and a county check, both belonging to the City. As of June 30, 1933, she was given credit for $51,493.81, when her books actually reflected a balance of only $279.71. Some $20,000 of this error arose because the auditor credited her with $20,000 of July receipts which were not as yet charged to her, as the audit was of June 30, 1933. But it is urged that the diversions enabled her to avoid overdrafts, and that, if overdrafts had occurred, suspicion would have been directed towards her. However, it is useless to conjecture as to the other means she might have employed in order to avoid overdrafts. Whether her scheming mind would have devised a way in which to manipulate or juggle her funds and accounts so as to avoid overdrafts by other methods need not now be determined. Suffice it to say that the evidence herein is not convincing that her diversions enabled her to conceal her shortage, or to continue her embezzlements.

Summarizing, therefore, it seems clear that the proximate cause of the loss to the City initially was the abstraction by Marie Brown of $160,878.74 from the cash drawer of the City; that the loss was not a concealed loss, but one which was open and apparent to anyone making a reasonable examination and audit of Marie Brown's books and bank accounts; that the proximate cause of the failure to discover the loss was the nonfeasance and malfeasance of the City, County and State officials who were charged with the duty of inspecting, examining and auditing her accounts; and that the evidence was insufficient to compel the conclusion that had it not been for the diversions of School District funds to the City of which the plaintiff complains, the loss to the City would have been discovered before it was discovered, or would have been less than it was. It is our opinion that the evidence justified the trial court in finding that the City was benefited by the use of the School funds diverted to the City's account, and that the City was therefore obligated to restore the excess diversions to the School District. Findings made in a jury-waived case will not be set aside unless clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 505; McGee v. Nee, 8 Cir., 113 F.2d 543, 546. Consequently, when on these dates in July and August, 1936, Marie Brown returned to the School District certain checks and warrants payable to the City, she merely restored to the School District that which the City legally owed to the District, and no damages ensued. Atlantic Cotton Mills v. Indian Orchard Mills,

1888, 147 Mass. 268, 17 N.E. 496, 9 Am.St. Rep. 698; Town of New Haven v. Weston, 1913, 87 Vt. 7, 86 A. 996, 46 L.R.A.,N.S., 921; Chapple v. Merchants' National Bank, 1933, 284 Mass. 122, 187 N.E. 232; Newell v. Hadley, supra.

But not only should the trial court's conclusions as to nonliability of the bank be sustained because this was not a concealed shortage and the City was benefited by the diversions requiring restoration to the School District, but the admitted facts indisputably establish that plaintiff has accepted and received the benefits of all of the diversions by Marie Brown back and forth between the City and School District, and has itself been benefited by the very diversions which it now attacks. During her tenure as City Treasurer, Marie Brown diverted $848,399.71 of City money to the School District, and all but $125,100.02 of this amount was diverted after May 21, 1931, when plaintiff's current bond went into effect. These diversions unquestionably breached Marie Brown's bond, and plaintiff would have been liable for all of such diversions up to the amount of its bond in absence of the contra diversions which both the City and the Surety Company recognized and computed in determining the amount in which the surety should respond on its bond. In other words, the fact that the plaintiff paid only the difference ($98,326.59) between the total embezzlements from the City ($160,-878.74) and the net diversions from the School to the City ($62,552.15), impels the conclusion that plaintiff itself has received and accepted all the benefits of the diversions which it now avers constituted no benefit to the City. How can plaintiff urge in this proceeding that the City obtained no benefit of the $62,552.15, the net diversion to the City from the School District, when it deducted that amount from the City's total loss in settling with the City? If the benefit to the City had not been recognized, it would have been required to respond in the full amount of its bond. Moreover, it may be pointed out that, during her tenure in office as School Treasurer, Marie Brown diverted some $910,951.86 of School funds to the City, and all but $355,-579.94 of this amount was diverted after July 1, 1932, when plaintiff became surety for the School Treasurer. During the six weeks before the discovery of the shortage, she diverted more than $72,000 of the City money back to the School District. If she had not made this diversion, plaintiff would have been required to pay the School District the full amount of its last bond. It seems clear that, in settling with both the City and the School District on these bonds, plaintiff took advantage of the very diversions which it now seeks to recover as subrogee of the City. No other conclusion can be drawn but that, in making the settlement with the City and the School District, the plaintiff recognized the propriety of the return to the School District of the exact sum which in this proceeding it asserts was wrongfully diverted. Not only the surety, but the City itself, recognized and acquiesced in all the diversions of City money to the School District in pro tanto reduction of the net diversion of money from the School District to the City. The settlement arranged with the surety was effected on that basis. That the School District likewise acquiesced in and consented to the application of diversions to reduce its loss is apparent, because the total diversions amounted to $910,951.86, but with the acceptance of the pro tanto reduction of the diversions to it of the City's money, the loss was reduced to something over $60,000. In view, therefore, of this consent and approval by both the City and the School District, as well as the plaintiff, to the pro tanto reductions for diversions back and forth, and the fact that the alleged diversions, consisting of the six items sued upon herein, were necessarily considered to be a proper return of funds belonging to the School District, the plaintiff cannot be heard to say that no benefit inured to the City from the use of the School District funds and that the return of the funds to the School District was improper. If the parties themselves, in effecting a settlement, consented to and considered the very diversions in question as a pro tanto reduction of the loss to the School District, obviously it was treated as a proper return of funds in reduction of the loss which was sustained by the School District. That the parties may consent to a mitigation of a loss, even though there is a wrongful diversion, cannot be doubted, and this is true regardless of the provisions of the 1919 South Dakota Revised Code, which read:

"§ 1987. The detriment caused by the wrongful conversion of personal property is presumed to be: 1. The value of the property at the time of the conversion, with the interest from that time; * * *."

"§ 1988. Presumption Cannot be Repelled. The presumption declared by the preceding section cannot be repelled, in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent."

It was the concurrence of the plaintiff with the City and the School District which resulted in the application of a pro tanto reduction for the benefit of all of the parties, and clearly, under such circumstances, these statutes do not condemn that which they themselves approved and ratified. See Stone v. Chicago, Milwaukee & St. Paul Ry. Co., 3 S.D. 330, 336, 53 N.W. 189, 191, wherein the court said:

"Even if the defendant was guilty of conversion, yet it had the right to show that the plaintiff had not been damnified by the act of conversion, or that his damages were merely nominal. The owner of property that has been converted by another can only recover as compensation an amount in damages commensurate with his actual loss; and any facts which, if established by proof, will go towards a mitigation of damages, are competent evidence in a trial of an action of trover or conversion."

See, also, Coan v. Plaza Equity Elev. Co., 61 N.D. 627, 239 N.W. 620; Burke County v. First National Bank, 5 Cir., 73 F.2d 783; City of Parsons v. Fidelity & Deposit Co., D.C.Kan., 29 F.2d 417.

However irregular the conduct of the bank officials may have been in permitting the diversions back and forth, no one characterizes such conduct as willful. In all of its dealings, the bank acted in good faith. As was stated in Shank v. Peoples State Bank, 104 Ind.App. 443, 458, 7 N.E.2d 46, 52: "It would be a travesty of justice to forbid a litigant from showing and establishing as a defense that no harm or damages resulted from an irregular or unlawful act."

The trial court found that, prior to the discovery of the fraud, none of the officers or employees of the bank knew or suspected, or had reasonable cause to know or suspect, any of the wrongful acts of Marie Brown; that the defendant bank acted in good faith in accepting her deposits and honoring the withdrawals and was not chargeable with any wrongdoing. It is fair to assume that the trial court was motivated in making the above finding because of the confusion that the City, School and County officials permitted and continued regarding these two accounts and the failure to make proper distinction between the capacities of the City and the School Treasurer. While separate books were kept, there was only one office for the School and City Treasurer. The clerical help was the same. As illustrative of the loose and careless method employed by the City and School officials, the following may be referred to. The School District used a form of order in authorizing payments of its ordinary expenses addressed to the City Treasurer instead of the School Treasurer, although the order was signed by the Clerk of the Board of Education, Aberdeen, South Dakota. Of the 904 school warrants issued between 1927 and 1936, 491 were payable to the City Treasurer; 402 were made payable to "Treasurer"; and 11 were made payable to individuals. Again, it may be noted that the County Treasurer, in issuing checks for the purpose of paying tax money to the School District or the City, often made such checks payable to "Marie Brown," or "Marie Brown, Treasurer," without indicating whether they were issued to her in her capacity as School or City Treasurer. The endorsement stamp of the City was frequently used to endorse items belonging to the School District, but, notwithstanding this improper endorsement, the great majority of such items were deposited in the proper account. In one instance, the County Treasurer issued a single check for both City and School funds, and there were times when he made checks payable to her as City Treasurer which should have been made payable to her as School Treasurer. It is entirely probable, therefore, that the method which was followed by the various officials referred to, in conducting the affairs of the County, City and School District, caused the bank employees to assume that the various transfers and diversions as between the City and School District accounts were proper and free from wrongdoing.

Prior to the discovery of her fraud, Marie Brown was not only a City employee who apparently had served long and faithfully, but at no time was there any suggestion by any of the City or County officials that she was not conducting her affairs properly and honestly. In fact, she was apparently trusted to such an extent that, on many occasions, she was permitted by the other City officials to receive checks payable to "Marie Brown," or "Marie Brown, Treasurer," without any indication

982

as to the account to which credit should be entered. Undoubtedly, there was a discrepancy between a check payable to "Marie Brown, School Treasurer" and the endorsement "City of Aberdeen, Marie Brown, City Treasurer." However, the parties have stipulated that the large majority of checks endorsed in that manner were deposited to the credit of the School account notwithstanding the irregular endorsement. She had no personal funds in the defendant bank, and at no time during the period in question had she drawn out any official funds for her own personal use. Every month the bank reported the true condition of the City and School accounts, and no complaint was ever brought to the attention of the bank officials. For years the employees of the bank followed her direction as to the accounts to which credit should be given when various deposits were made. The bank knew that regular audits were made of both accounts. Granted that there is not unanimity among authorities as to the strict liability of banks under such circumstances, we believe that the record before us justifies the application of the views set forth in Rodgers v. Bankers National Bank, 179 Minn. 197, 229 N.W. 90, wherein the Minnesota court, in commenting on the liability of a bank in permitting a trustee to endorse checks payable to him in his trust capacity and to deposit them to his private account, stated (179 Minn. at page 205, 229 N.W. at page 93):

"Granting that the rule of liability tends to prevent losses the good resulting therefrom is not commensurate with the hardship involved incident to (1) the necessary examination of items offered for deposit, (2) the necessary inquiry, sometimes offensive, often productive of discord, and many times necessarily unproductive of the desired results, and (3) the imposition of a considerable expense upon the bank to watch for the wrongdoing of persons outside its own organization, which expense, theoretically, is passed on to the public composing its patrons. It may be that such a rule would necessitate employees of greater learning and ability—certainly demanding those capable of an exacting duty commensurate with the responsibility involved. Obviously the receiving teller, under the rule of liability must be one able to inoffensively question the depositing customer as to his authority to do what he is offering to do. But may the bank safely accept the fiduciary's assurances of his authority? We think not. If not, why ask for them?"

It seems to us that, under the unusual circumstances of this case, the trial court was not required to find that the officials of the bank, in accepting the deposits of Marie Brown and crediting them to the accounts designated by her, were guilty of any actionable wrong or that the bank had notice of, or was chargeable with knowledge of, either her defalcations or her misapplications of funds. Her method of handling her accounts at the bank over a long period of years without objection from anyone, could, we think, properly be considered by the trial court in determining whether the bank had committed any actionable wrong in its handling of her deposits and withdrawals, and the finding of the trial court in that regard should not be set aside as being clearly erroneous.

There were other errors assigned which we do not find it necessary to discuss. It is our view that the trial court arrived at the right conclusion in its disposition of this controversy, and therefore the order of dismissal should be and is affirmed.