[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 799 
The Williams County State Bank, hereinafter referred to as the Williston State Bank, became a depository for $10,000 of the public funds of the plaintiff, the city of Williston, on or about June 6, 1921, under the provisions of chapter 56 of the Laws of 1921, which sum was placed and deposited in said bank between June 15th and August 1st of that year by defendant N.B. Ludowese, then, and until and including the year 1923, the city treasurer of said *Page 801 
city. On the 14th day of April, 1923, the defendant Ludowese, city treasurer, deposited of the public funds of the city in said bank an additional sum of $17,580.23, and received from the bank a paper known as a certificate of deposit, dated that day, reciting that the city of Williston has deposited in said bank said sum of money payable to the order of itself six or twelve months after date with interest at the rate of 6 per cent per annum; and at the same time, as security for the payment of said sum, the bank by its president and cashier executed and delivered to said Ludowese a warranty deed conveying to said Ludowese in his individual name two certain tracts of land within the city of Williston, then occupied by tenants, and also executed and delivered to Ludowese in his own name a certain assignment of rentals due or to become due from the tenants occupying said premises. And, further, the bank delivered to said Ludowese mortgages owned by it, aggregating approximately $4,500, covering farm lands. Said additional deposit of $17,580.23 was so made by defendant Ludowese without the authority, approval or knowledge of the city commission of the city of Williston. The defendant Ludowese did not record said deed in the office of the register of deeds. It appears that the defendant Williston State Bank was in financial difficulties. This condition however was not known to Ludowese at the time of said over-deposit, so-called. On or about the 24th day of January, 1923, Rodman, the president of the bank, endeavored to secure a loan for the bank of $50,000 from the depositors' guaranty fund commission and the Bank of North Dakota, and offered as security therefor certain real estate of the bank, including the real estate situated in the city of Williston involved in this action. The Bank of North Dakota thereupon or shortly afterwards advanced to defendant bank upon said proposed loan the sum of $15,000, for which collateral security, consisting of notes owned by the bank, was given. In connection with the making of this loan a Mr. Desmond, representing the depositors' guaranty fund commission, went to Williston, checked up the bank and the securities offered by the president and made report thereon to the said depositors' guaranty fund commission. Later a meeting of the commission and the State Bank Examiner was held at Max, North Dakota, and the proposition of the loan was discussed. It was then learned that certain of the securities the bank had promised as security for the loan aforesaid *Page 802 
were not available; and that the city real estate of the bank located in the city of Williston had been parted with, pledged or conveyed so that the title was not in the same condition as when the agreement for the loan was made. Thereafter and on or about May 20, 1923, upon a request by telephone, C.R. Green, manager of the Bank of North Dakota, went to Williston for the purpose of completing the loan, provided this could be accomplished under the terms as to security formerly agreed upon. Desmond was then at Williston. Green met and had consultations with one or two groups of business men of the city, which included the president of the city commission and one or two other members thereof, the object of which was to devise means by which the loan aforesaid might be consummated. Desmond was present at one or both of such meetings. Green remained during Monday, the 21st, and thereafter returned to Bismarck. Desmond remained at Williston to close the transaction for the loan. The bank executed and delivered to him a mortgage dated May 23, 1923, conveying to the Bank of North Dakota the real estate in question and other real estate and collateral notes to secure to it the payment of $50,000 on demand. On the same day this mortgage was filed for record in the office of the register of deeds in and for Williams county and recorded therein. After the filing of the said mortgage in the office of the register of deeds, and on the same day, Desmond went to the office of Ludowese and after some short delay, but on the same day, received from him the deed and assignment of rents which had been executed and delivered to Ludowese by the Williston State Bank. The Williston State Bank was closed to business June 12, 1923, and in due course L.R. Baird became the receiver thereof under appointment of the court, took charge, and now has charge, of the affairs of said bank. On August 4, 1923, Ludowese executed and delivered to the Bank of North Dakota an assignment to it of the assignment of the rents which had been delivered to him by the Williston State Bank. He did not at any time execute and deliver to the Bank of North Dakota, or anyone for it, a deed to the premises described in the deed delivered to him by said bank. September 12, 1923, the plaintiff, city of Williston, instituted this action. The complaint recites the facts relative to said deposit of $17,580.23, the giving of the security therefor by the said Williams County State Bank, the delivery of the said warranty *Page 803 
deed and of the assignment of the rentals to the Bank of North Dakota, the insolvency of the bank, and alleges that the delivery of said deed and assignment by defendant Ludowese to the Bank of North Dakota was wholly beyond his power and authority so to do, and praying that the plaintiff be declared to have a lien prior and superior to any claim or lien of the defendant state of North Dakota, doing business as the Bank of North Dakota, upon the real estate in said deed described; that the defendant surrender to the plaintiff said deed and said assignment of rentals or in the event of failure so to do the decree of the court stand in lieu thereof.
The defendant, the state of North Dakota, doing business as the Bank of North Dakota, and hereinafter referred to as the Bank of North Dakota, in answer to the complaint, interposed a general denial, and further alleged: "That on or about March 23, 1923, the defendant, the Williams County State Bank, was, or pretended to be, the owner in fee simple of the lands and premises and the personal property described in the complaint, free of all encumbrances, and was then in the actual possession thereof. That said defendant, believing the said Williams County State Bank to be the owner of said premises and property, agreed, together with the guaranty fund commission, to raise the deposits of this defendant from about $15,000 to $50,000, upon receiving the lands and premises and personal property described in the complaint and certain other specified property as security for the money so deposited and placed with the defendant, the Williams County State Bank, and did advance $35,000 to said Williams County State Bank; whereupon the said Williams County State Bank gave the mortgage and assignment mentioned in plaintiff's complaint, and which said mortgage and assignment was dated on the 23d day of May, 1923, and which mortgage contained a covenant on the part of the said Williams County State Bank that it was absolutely seized of said premises and that the same were free from all encumbrances. That said additional sum of $35,000 was actually paid by this defendant to the said Williams County State Bank, and the total sum of $50,000 was left as a deposit in said bank at the time of the date of said mortgage or shortly thereafter, and that this defendant had not at the time of said mortgage or at any time before the giving of said mortgage or of the said payment of the so deposited money any notice whatever, either *Page 804 
express, implied or otherwise, of the said mortgage or lien claimed by the plaintiff, or of any other encumbrances whatsoever that affected said premises or the security it received, and that plaintiff's said claim was not then of record nor has the same ever been recorded."
The defendant further alleges: "That the plaintiff is estopped from claiming said property or any part thereof or any lien thereon prior or superior to this plaintiff." And as grounds therefor states: "That the plaintiff well knew that the Williams County State Bank was then in failing circumstances and hard pressed for money, and that the plaintiff, its city commissioners and the individual members thereof, and its treasurer, the defendant Ludowese, were all well acquainted with the condition of the said Williams County State Bank and were actively engaged in assisting the said Williams County State Bank in obtaining the money and funds above described from this defendant, and was aware of and fully informed of the security this defendant demanded for the loan to be advanced by this defendant, and that they, and each of them, acting in conjunction with the said defendant Williams County State Bank to persuade and induce this defendant to advance said additional sum of $35,000 and leave the total sum of $50,000 in said bank, with full knowledge of the kind and character of the security demanded by this defendant, and that the said Williams County State Bank would give this defendant as security for said sum of money (the said property and assignment), but neither the plaintiff, the city of Williston, its city commissioners or any individual thereof, or its treasurer, the defendant Ludowese, or any of them, made any objection to the giving of said security to this defendant, nor gave this defendant any notice of any claim or lien to said property or any part thereof."
Neither Ludowese nor the Williams County State Bank answered. Upon these issues trial was had. The court found the facts with reference to said over-deposit, the execution and delivery of the deed and assignment of rentals to Ludowese, the treasurer of the city, and of the mortgage and assignment to the Bank of North Dakota, and further: "That said deed and conveyance of said real estate, as well as the assignment of the rentals from the said real estate, were executed by said bank and accepted by said Ludowese for the purpose of security only for the repayment of the said public funds aforesaid of said city *Page 805 
so wrongfully and unlawfully deposited in said bank, and the said deed of conveyance and assignment of rents, and each thereof, were by said bank so made, executed and delivered and by said Ludowese accepted and received for the sole benefit of the said city of Williston, and the said property, together with the said deed of conveyance, as well as the assignment of rent thereof, were so taken and held in trust only by the said N.B. Ludowese solely for the benefit, as aforesaid, of the city of Williston; that no part of the said sum of $17,580.23 aforesaid, nor the interest thereon, has ever been paid." This finding is not challenged by appellant.
The court further found: "That said, the Bank of North Dakota, as well as C.R. Green, as the Manager of said bank, on and prior to the 23d day of May, 1923, had full and actual notice and knowledge of all the facts aforesaid, including the facts of the wrongful and unlawful deposit of said $17,580.23 of the public funds of said city of Williston by N.B. Ludowese as its treasurer in said Williams County State Bank, and of the execution and delivery by said bank to said Ludowese of the said warranty deed and the assignment of rents covering the real estate hereinbefore described solely as security for the repayment of the said sum of $17,580.23 by said bank to said city and that said deed and assignment aforesaid and the said real property aforesaid had been and was so conveyed by said bank to, and the same was held by, the said Ludowese only in trust as aforesaid for the said city of Williston."
The court also found: "That the said defendant, N.B. Ludowese, without consideration and without authority from the city of Williston so to do, turned over and delivered to the said defendant, the Bank of North Dakota, the said warranty deed and assignment of rents aforesaid, without, however, executing any instrument of conveyance or otherwise at said time or thereafter, save only thereafter on August 4, 1923, at the request of the defendant, the Bank of North Dakota, the said N.B. Ludowese, without consideration and likewise without authority from said city so to do, signed and delivered a purported written assignment of the rents of the said real estate hereinbefore described to the said defendant, the Bank of North Dakota."
The trial judge further found that neither the plaintiff nor any member of the board of city commissioners of said city was actively *Page 806 
engaged in assisting said Williams County Bank in obtaining the money or funds under the said loan from the bank of North Dakota. This finding, in so far as it may refer to the activity of the members of the city commission acting in their individual capacity, is clearly contrary to the evidence.
The court concluded that the warranty deed aforesaid was and is adjudged to be a mortgage and was executed and taken as security only for the repayment of the deposit aforesaid and the interest thereon; that the city of Williston is the absolute owner of said mortgage and that said conveyance to the said Ludowese was prior and superior to the mortgage of the defendant Bank of North Dakota, and ordered judgment for the plaintiff in said action.
Judgment was entered on the findings and conclusions of the court in accordance therewith, from which judgment the Bank of North Dakota prosecutes this appeal. A trial de novo is demanded. Throughout the course of the opinion we will have occasion to more fully and in detail examine the evidence as developed upon the trial of the case, applicable to the question immediately under consideration.
Appellant, the Bank of North Dakota, asserts that plaintiff is not in position in a court of equity to rely upon the transaction between the Williston State Bank and the city treasurer, so as to defeat the rights of appellant under its mortgage, in that the pledging by the bank of its assets to secure the deposit in question is ultra vires so far as it affects said Williston State Bank. The receiver, by leave of court, has also filed briefs, attacking the transaction. He insists that the State Bank had no authority in law so as to pledge its assets; that to do so was an assumption of power not incidental to the objects of its incorporation and unnecessary to carry on the business or for the attainment of the purpose of its creation, and that the contract contravenes public policy.
The defense ultra vires is a special defense. It is not available under the general denial, but, to be taken advantage of, must be specially pleaded. See Frankel v. Hiller, 16 N.D. 387, 113 N.W. 1067, 15 Ann. Cas. 265; Blackwood v. Lansing Chamber of Commerce, 178 Mich. 321, 144 N.W. 823; 25 Standard, Proc. 143; 13 C.J. 742; 7 R.C.L. 677, § 678.
But conceding the question is raised upon the record, yet, where *Page 807 
the corporation, which has received the benefit of an ultra vires contract, is estopped by equitable considerations from avoiding that contract, such contract cannot be avoided by one succeeding to its rights, with notice of such contract. 14 C.J. 334. It therefore becomes necessary to determine the rights and powers of the receiver of the State Bank in relation to the contract in question. The receiver of the bank became such under the order of the court, exercising its powers and authority with reference thereto, and particularly having in view chapter 137, Laws of 1923. See State v. First State Bank, 52 N.D. 231, 202 N.W. 391, where chapter 137 is set forth verbatim, and Baird v. Lefor,52 N.D. 155, 38 A.L.R. 807, 201 N.W. 997. Section 8, referring to the powers of the receiver, recites "which receiver shall have all the powers and authorities ordinarily possessed and exercised by receivers of insolvent corporations or prescribed by statute, and the court shall have all the power and authority with regard to the administration and closing of the affairs of said banks as are ordinarily possessed and exercised by courts of equity over the affairs of insolvent corporations." Thus the receiver of the bank in question was clothed with no greater authority than ordinarily possessed and exercised by receivers of insolvent corporations. His appointment deprived the officers of the bank of the power to do any further acts which would affect the bank or its property. It had the effect of transferring to him as an officer of the court the title to, and right of possession of, all the property, real and personal, of the bank to be administered for the use and benefit of the creditors of the bank. Brynjolfson v. Osthus, 12 N.D. 42, 96 N.W. 261, and cases cited. Necessarily the receiver holds the title and right of possession of such property by the same right and title as the corporation, the bank, and subject to liens, priorities and equities existing at the time to which his appointment refers. The title to the property which he acquires is no other, greater, better interest, right or equity than had the debtor. 34 Cyc. 191 states the rule to be: "A receiver can acquire no other, greater or better interest than the debtor had in the property, and to this extent the receiver has been held to stand in the shoes of the debtor; he has the same right which the insolvent would have had, and can set up no rights against claims which the debtor could not have set up." See also 23 R.C.L. 56; Pom. Eq. Rem. §§ 186, 187; Gilbertson *Page 808 
v. Northern Trust Co. ante, 502, 42 A.L.R. 1353, 207 N.W. 42; Widman v. Kellogg, 22 N.D. 396, 39 L.R.A.(N.S.) 563, 133 N.W. 1020.
The facts relative to the deposit of the money in question are not in dispute. The money in question was public funds belonging to the city of Williston in the proper custody and control of its treasurer, defendant Ludowese. He placed the money in the bank as such treasurer. The bank issued a certificate of deposit wherein it undertook to repay the money to the city of Williston in six or twelve months from the date thereof, with interest at the rate of 6 per cent per annum, and at the same time for the purpose of securing the repayment of said money, when due, delivered the deed and assignment in question. The money was actually paid, the security actually delivered. Neither fraud nor false representations are charged against either party; nor is it contended that the act of the bank is prohibited by positive law or that it is inherently vicious except as it is assailed as an overreaching of corporate powers and as against public policy. The bank continued to do business for upwards of sixty days thereafter.
The powers of state banks are defined by § 5150, Comp. Laws 1913, subdivision 3 provides it shall have power "to make contracts." Subdivision 4, "to sue and be sued." Subdivision 7 thereof provides that it shall have power "to exercise all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, bills of exchange, drafts and other evidences of debts, by receiving deposits, etc." Our attention has been directed to no statute relating to state banks whereby the legislature has either authorized or forbidden banks to hypothecate assets to secure repayment of money placed therein as a deposit. We seem to have no such statute in this state dealing specifically with the question.
It is now well settled that banks may borrow money for their corporate purposes, and the right to borrow money carries with it the power to secure said indebtedness by mortgage or otherwise. 7 C.J. 592; 3 R.C.L. 427; Auten v. United States Nat. Bank,174 U.S. 125, 43 L. ed. 920, 19 Sup. Ct. Rep. 628. The transaction in question bears all the necessary elements of a loan by plaintiff to the bank. Had the parties to the transaction denominated it a "loan" instead of a "deposit," it would scarcely be questioned that the bank would have *Page 809 
had power and authority to have hypothecated its assets for the security of the payment thereof. However unlawful the transaction might have been, it is not ultra vires so far as the bank is concerned.
Upon the question as to the implied power of a bank to pledge its assets to secure the payment of deposits, the authorities are not in harmony. The case of Commercial Bkg. T. Co. v. Citizens Trust G. Co. 153 Ky. 566, 45 L.R.A.(N.S.) 950, 156 S.W. 160, Ann. Cas. 1916C, 166, is, however, the only case cited in the briefs directly challenging and declaring ultra vires and void a pledge of securities given to secure the deposits of county public funds. The Commercial B. T. Co., desiring to secure at least a part of the deposits of the county treasurer of Jefferson county, entered into an agreement with him, whereby it obligated itself to furnish said treasurer security in the sum of $100,000 to secure the safety of any and all deposits which he might, as treasurer, make in said bank. The defendant Citizens T. and G. Co., which had executed the bond of the treasurer to the county, likewise became the surety for the bank on its said bond to the treasurer, but, before doing so, exacted of the bank a pledge of its liquid assets in the sum of $100,000 to secure it against loss. The bond of the bank to the treasurer was executed by the defendant as surety, and the bank pledged with said surety, certificates of deposit and short term negotiable notes to the amount of $100,000. The decision is based on the grounds that "there is no statute requiring the deposits of the county treasurer to be secured by the depositary and there is no express power under which the bank was authorized to secure him by a pledge of its assets; no necessity exists for its so doing in order to enable it properly to conduct its business as a banking institution." The following authorities apparently sustain the power of the bank to pledge its assets, if not directly, at least indirectly. Richards v. Osceola Bank, 79 Iowa, 707, 45 N.W. 294; Ward v. Johnson, 95 Ill. 215; Ahl v. Rhoads, 84 Pa. 319; McFerson v. National Surety Co. 72 Colo. 482, 212 P. 489. We notice briefly the Colorado case of McFerson v. National Surety Co. The plaintiff, who was in charge of the insolvent Louisville bank, sought to recover from the defendant certain securities received by it under the following circumstances. Said bank, and another with which it was associated, had agreed with the county treasurer of Boulder county that, in consideration of his depositing *Page 810 
county moneys with them, they would give him indemnifying bonds. In pursuance to that agreement the defendant became surety for the banks, and received bank collateral to indemnify it against loss. The facts in this case, it will be noted, are almost identical with those in the Kentucky case of Commercial Bkg. T. Co. v. Citizens Trust G. Co. supra.
The court said: "The right of the treasurer to deposit the money in the banks is not involved. . . . There is no question that a bank, in order to secure deposits, may give security for them. . . . The bank owned the securities pledged to the surety company and had full right to so pledge them."
We are not required, however, in the proper disposition of this case, to determine whether or not state banks organized and existing under the laws of this state, have such implied power and authority and we leave the question undecided. Under the facts and circumstances of this case, while the contract in question may have been voidable, it was voidable, only, prior to completed execution of the transaction. The general rule is that ultra vires transactions, not mala in se or mala prohibita, are recognized as unassailable and are permitted to stand as the foundation of rights acquired under them after they have been fully performed on both sides, and banks are not excepted from the operation of the rule. The following authorities show the rule to have been very generally adopted. Anderson v. First Nat. Bank, 5 N.D. 451, 67 N.W. 821; Clarke v. Olson, 9 N.D. 364, 83 N.W. 519; Tourtelot v. Whithed, 9 N.D. 467, 478, 84 N.W. 8; Wald v. Wheelon, 27 N.D. 624, 147 N.W. 402; Lewis v. American Sav. Asso. 98 Wis. 203, 39 L.R.A. 559, 73 N.W. 793; Eastman v. Parkinson, 133 Wis. 375, 13 L.R.A.(N.S.) 921, 113 N.W. 649; Crowder State Bank v. Aetna Powder Co. 41 Okla. 394, L.R.A. 1917A, 1021, 138 P. 392; Blackwood v. Lansing Chamber of Commerce,178 Mich. 321, 144 N.W. 823; Bell v. Kirkland, 102 Minn. 213, 13 L.R.A.(N.S.) 793, 120 Am. St. Rep. 621, 113 N.W. 271; Mutual L. Ins. Co. v. Stephens, 214 N.Y. 488, L.R.A. 1917C, 809, 108 N.E. 856; Dillon v. Myers, 58 Colo. 492, 146 P. 268, Ann. Cas. 1916C, 1032; Creditors Claim Adjustment Co. v. Northwest Loan T. Co. 81 Wn. 247, L.R.A. 1917A, 737, 142 P. 670, Ann. Cas. 1916D, 551; Kelly v. Central Union F. Ins. Co. 101 Kan. 91, L.R.A. 1918C, 1170, *Page 811 
165 P. 806; 7 C.J. 596; 14a C.J. 319 et seq.; 7 R.C.L. 674, §§ 677, 678, 680.
In the case of Clarke v. Olson, 9 N.D. 364, 83 N.W. 519, the court discussing the question of a transaction alleged to be ultra vires quoted with approval the language used by the supreme court of Wisconsin in Lewis v. American Sav. Asso. as follows: "`It is well settled that a corporation cannot avail itself of the defense of ultra vires when the contract in question has been in good faith performed by the other party, and the corporation has the full benefit of the performance of the contract. Much less will the claim that the transaction was ultra vires be allowed as a ground for rescinding the contract and restoring to the complaining party on that ground the property or funds with which he has parted, after he had had the benefit of full performance of the contract by the other party; and, in general, the plea of ultra vires will not be allowed to prevail, where interposed for or against a corporation, when it will not advance justice, but, on the contrary, will accomplish a legal wrong.' Kadish v. Garden City Equitable Loan Bldg. Asso. 151 Ill. 531, 42 Am. St. Rep. 256, 38 N.E. 236; Whitney Arms Co. v. Barlow,63 N.Y. 62, 20 Am. Rep. 504; Union Nat. Bank v. Matthews,98 U.S. 628, 629, 25 L. ed. 188, 190. `Where it is a simple question of capacity or authority to contract, arising either on a question of regularity of organization or of power conferred by the charter, a party who has had the benefit of the agreement cannot be permitted, in an action founded on it, to question its validity. It would be in the highest degree inequitable and unjust to permit the defendant to repudiate a contract, the fruits of which he retains.' Sedgw. Stat. Const. Law, 73. In 2 Beach on Private Corporations, § 425, the subject is fully considered, and numerous modern authorities are cited, showing that `where a contract has been in good faith fully performed, either by the corporation or the other party, the one who has received the benefit of it will not be permitted to resist its enforcement by the plea of a mere want of power.' Darst v. Gale,83 Ill. 136; Carson City Sav. Bank v. Carson City Elevator Co.90 Mich. 550, 30 Am. St. Rep. 454, 51 N.W. 641; Holmes G. Mfg. Co. v. Holmes W. Metal Co. 127 N.Y. 260, 21 Am. St. Rep. 448, 27 N.E. 831; Rider Life Raft Co. v. Roach, 97 N.Y. 378; Bradley v. Ballard, 55 Ill. 415, 8 Am. Rep. 656, 3 Mor. Min. Rep. 563; State *Page 812 
Bd. of Agri. v. Citizens' Street R. Co. 47 Ind. 407, 17 Am. Rep. 702; Oil Creek A.R.R. Co. v. Pennsylvania Transp. Co. 83 Pa. 160, 166, 2 Mor. Min. Rep. 421." It would be surprising if the law were not as indicated by these authorities.
The contract in question, being for the security of public moneys illegally deposited, should not be declared to be against public policy and void. While the deposit may have been illegal, the security contract is not contrary to any express prohibitory statute; it is not contrary to good morals; it stipulates for nothing malum in se or malum prohibitum. "The power to invalidate an agreement on the ground of public policy is so far reaching and so easily abused that it should be called into action to set aside or annul the solemn engagements of parties dealing on equal terms only in cases where the corrupt or dangerous tendency clearly and unequivocally appears upon the face of the contract itself, or is the necessary inference from the matters which are expressed, and that the only apparent exception to this general rule is to be found in those cases where the contract, though fair and unobjectionable on its face, is a part of a corrupt scheme and is made to disguise the real nature of the transaction." 6 R.C.L. 711.
"Whether a contract is against public policy is a question of law for the court to determine from all the circumstances of each case. It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts; and therefore agreements are not to be held as being contrary to public policy unless very clearly contrary to what the legislature or judicial decisions has declared to be the public policy or manifestly tend to injure the public in some way." 13 C.J. 427.
There is another reason why neither appellant nor the receiver can challenge the contract in question as ultra vires. Under the facts and circumstances which appear in this case, the sovereign alone can be heard to object, and then only in a direct proceeding to oust the corporation of its usurped powers. First Nat. Bank v. Messner, 25 N.D. 263, 141 N.W. 999; Security Nat. Bank v. St. Croix Power Co. 117 Wis. 211, 94 N.W. 74; Eastman v. Parkinson, 133 Wis. 375, 13 L.R.A.(N.S.) 921, 113 N.W. 649; First Nat. Bank v. Flath, 10 N.D. 281, 285, 86 N.W. 867; Anderson v. First Nat. Bank, 5 N.D. 451, 67 N.W. 821; Mutual L. Ins. Co. v. Stephens, 214 N.Y. 488, *Page 813 
L.R.A. 1917C, 809, 108 N.E. 856, L.R.A. 1917B, 826, note; 14a C.J. 335; 7 R.C.L. 681, § 681. Counsel for the receiver also insists that the giving of the security in this case is in fraud of the creditors of the bank, and cites § 8436, Comp. Laws 1913, as applying.
It will be noted from a perusal of defendant's answer that fraud is not therein pleaded. Fraud is an affirmative defense and to be relied on as constituting the fraud must be alleged, and the issues thereon framed, so that evidence thereof may be adduced upon the trial. Nor was the question raised in any manner upon the trial of the case. There was no issue of fraud presented on the trial for the trial court to pass on, and it is self-evident there is no basis in the pleadings or in the evidence upon which this court can proceed to say whether or not there was fraud in this transaction.
We now come to a consideration of the other features of the case involving the correctness of the findings of fact and conclusions of law made by the trial court, observing that no other question than as hereinbefore disposed of, is raised concerning the right of the plaintiff to maintain and prosecute this action.
The questions for review, not already disposed of, presented by the record are essentially: One of notice to and knowledge of the appellant of the transaction between the Williston State Bank and the city of Williston and its treasurer; and one of estoppel, that is, whether, under the evidence in this case and the law applicable thereto, the plaintiff is estopped to maintain that the deed and assignment of rentals herein referred to are prior and superior to the claims of the appellant made under its mortgage and assignment; and whether or not the city treasurer or any other officer of the city waived the city's rights in and to the deed and assignment given the city treasurer as security for deposit hereinbefore referred to.
Inasmuch as this case is in equity and is here for trial de novo, the findings of the trial court are not clothed with the same presumptions in their favor as in cases triable to a jury wherein the jury is waived and the trial is had to the court. However, the findings and conclusions of the trial court upon the material facts in the case are entitled to some appreciable weight. Doyle v. Doyle, 52 N.D. 380, 202 N.W. 860; Security State Bank v. Wernick, 51 N.D. 219, 199 N.W. 948. *Page 814 
As to notice and knowledge of appellant of the contract between the Williston State Bank and plaintiff, the trial court found that appellant and its manager on and prior to May 23, 1923, had full and actual notice and knowledge of the deposit of said sum of $17,580.23; that the said money was the public funds of plaintiff, and also had notice and knowledge of the execution and delivery to the defendant Ludowese of the said warranty deed and assignment. The appellant asserts that the evidence before the court specifically shows that neither the Bank of North Dakota nor Green, the manager, or any other person acting for and in behalf of the bank, "had any definite or specific knowledge on orprior to May 23, 1923, of the purpose for which the WillistonState Bank had pledged the real estate and assignment of rents."
It is not claimed, then, that appellant did not have notice or knowledge of the pledge of the real estate and rents. It is simply claimed that appellant did not have any definite orspecific knowledge on or prior to May 23, 1923, of the purpose
for which the Williston State Bank had pledged the real estate.
With reference to the loan of the Bank of North Dakota to the Williston State Bank, the undisputed evidence shows that the Bank of North Dakota received security for the first $15,000 deposited with the Williston State Bank prior to May 23, 1923. As to the remaining $35,000, the undisputed evidence shows this money was not made available to and was not received by the Williston State Bank from the Bank of North Dakota or any other institution until between May 28 and June 1, 1923, from five to nine days after the mortgage to it was executed and delivered to Desmond and by him recorded in the office of the register of deeds. It is also undisputed that in the negotiations had at Williston immediately prior to, and which resulted in, the execution and delivery of the mortgage for $50,000 to the bank of North Dakota, Green was representing the Bank of North Dakota and also acting for and representing, so far as said loan was concerned, depositors' guaranty fund commission; that Desmond represented not only the guaranty fund commission in the actual taking of said mortgage, but also the Bank of North Dakota; that after Green's departure from Williston about May 21st, Desmond remained as the representative of the two institutions, — depositors' guaranty fund commission and the Bank of North Dakota, — to check up the securities, and have *Page 815 
the proper papers drawn and executed. The undisputed evidence also shows that Desmond received the $50,000 mortgage from the bank and the assignment of rents; that he received from Ludowese and carried with him the deed and assignment of rents which the Williston State Bank had delivered to Ludowese. It is also not disputed that Green, Desmond and the depositors' guaranty fund commission had some knowledge, prior to the making of the mortgage to the Bank of North Dakota, that the city real estate had been pledged in some manner to someone. There is no evidence in the record that there was any other city real estate belonging to the bank, than the real estate conveyed by that bank to the Bank of North Dakota, which includes that previously conveyed to Ludowese.
At Minot, on his way to Williston, Sunday, May 20, Green had a conference with two members of the depositors' guaranty fund commission, McMillan and Porter, relative to the affairs of the Williston State Bank. At that time and prior thereto the members of the depositors' guaranty fund commission had information that the city real estate of the bank had been pledged or hypothecated to somebody. McMillan testified with regard to the Minot conference:
Q. And did you have any talk with Mr. Green there that the real estate was not available as you put it?
A. I cannot recall that. But I presume so, Mr. Craven, because we talked it quite thoroughly and I cannot recall the circumstances of telling him that, but no doubt it was discussed.
Green testified:
Q. Mr. Green, you knew before coming to Williston, that some part of this real estate was encumbered in some manner so it was not available?
A. Well, yes, but I didn't know what it was.
In effect, Green states that he did not learn while at Williston the nature of the pledge of the bank's city real estate, or to whom or for what purpose it was pledged, but did learn, as appears from the following *Page 816 
testimony, that Ludowese was one of the parties holding some of the securities of the bank.
Q. But you do remember that Ludowese was connected up in some way?
A. Well, I think probably I got the information at the meeting that he was one of the parties that was holding some of these securities.
Q. Now you had some talk with Mr. Davidson on the following day, on Monday.
A. Yes, sir.
Q. Didn't Mr. Davidson ask you this question in substance that you would not want to see Mr. Ludowese personally held liable for the city funds?
A. I do not recall it.
Q. Or on Sunday night?
A. I think someone made the remark up in your office something about, I think it was Mr. Ludowese, I am not sure, those people were all strangers to me and I am not so sure who the remark was directed to, but I think probably it was about Mr. Ludowese having some children and it was a hard proposition for a man with a family, something of that kind.
Q. Now, what was it would be a hard proposition to Ludowese and his children?
A. Well, I got the idea that probably unless he could get indemnified in some other way in turning these securities back that he would not have any security, and as I remember that was the thing you were trying to work out in order to get something else to protect Mr. Ludowese.
Desmond was at the Sunday meeting. He testified there was not anything said at that meeting about calling a meeting of the city commission; that he did not remember of anything being said to Green about the city claiming any lien upon any of this property. That Desmond knew Ludowese held the deed and assignment of rents appears from the following:
Q. Did you at any time prior to the closing of this deal ascertain *Page 817 
that Mr. Ludowese had increased his deposits as city treasurer in that bank $17,580.23 within a very short time before you closed the deal?
A. I made no search.
Q. My question is did you ever ascertain that fact from anybody?
A. Yes, from somebody else I did. Mr. Rodman had told me so.
Q. And he told you that about the time that he told you that Ludowese held this pledge on the city property?
A. Very likely he did.
Q. Now, you made no inquiry whether or not that deed was ever given to Ludowese as security for that city fund, did you?
A. Probably the natural assumption would be that.
Q. You assumed then that it was?
A. I would say that I would assume that if he had any pledgesthat it was for that purpose.
On the other hand, Davidson, member of the city commission, testified that on Monday, after the Sunday conference, in a conversation with Desmond, he, Desmond, suggested a special meeting of the city commissioners be called "to pass a resolution to give up these securities that Ludowese had securing that deposit, and you (meaning Mr. Craven) informed him the city would not release Ludowese or the bonding company or anybody else from the responsibility of the deposit."
The president of the city commission, Craven, testified that the fact of the deposit of $17,580.23 came to his knowledge but a day or two prior to the Sunday evening conference the other witnesses have testified to; that he was present at the conference; that all present, including Green, took part in the discussion. Reciting the conversation at that meeting, he said: "Well, the main conversation was this, that the matter was being discussed there that Ludowese had taken security from the bank for this over-deposit of this city property, and the matter was up with reference to this loan being made by the Bank of North Dakota and the other banks to the Williams County State Bank, otherwise the Williams County State Bank would be closed unless the loan was advanced, and I feel very positive that that night I discussed it particularly with Mr. Green that I didn't see any way how the city's rights could be waived by the city council or by any of *Page 818 
its members." The meeting was not a meeting of the city commission. At the conference on Monday he testified, Davidson, Desmond and others were there.
Q. Now, did you have a conversation with Mr. Desmond at that time?
A. I did.
Q. What was that conversation, Mr. Craven, as you remember?
A. As a matter of fact when they came in first they came in and said that they wanted me as president of the city commission to call a special meeting of the city council, and I told them that I would not do so; that the city of Williston or its council or commission had nothing to do with making the over-deposit and knew nothing about the over-deposit until after it was made, and that I would not convene the city council to take any action that would in any way jeopardize or release the city's rights as against Mr. Ludowese the securities that he took or his bond.
Q. Do you know whether or not the matter of the release of the securities held by Ludowese or approving of the over-deposit or any action whatever has ever been taken by the city council?
A. It never has been before the city commission in any shape, form or manner, and up to long after the meeting in my office, as has been testified to, I daresay that none of the city commissioners knew anything of the over-deposit, unless Davidson and myself.
On cross-examination he testified:
Well, on Sunday, as I have stated before, I have a distinct recollection of speaking particularly to Mr. Green with reference to the city deposit and the question of what the city's rights would be and what the city had power to do, and sum and substance of what I told him that I couldn't see that the city's officials had any right to waive the city's rights in such matters.
Upon the facts as disclosed by the record and the reasonable inferences arising therefrom, we are of the opinion that the findings of *Page 819 
the trial court upon the question of knowledge of and notice to the appellant should not be disturbed.
It is conceded that the board of city commissioners did not authorize said deposit of $17,580.23, and it is not disputed that the deed given the city treasurer is in effect a mortgage of the bank's city property inuring to the benefit of the city to secure said deposit. The appellant contends that the city treasurer agreed to and did receive other securities in lieu of the deed and which were to be substituted for the deed; that a majority of the city commissioners, by their words, acts and deeds, indicated to appellant that they approved these securities and the substitution thereof for the deed, and induced appellant to consummate its loan to the Williston Bank. Appellant says: "What we ask is that the respondent be estopped from denying or being bound by its representations and affirmative acts of a majority of its commission in giving their consent to the substituting of securities and making known that consent to the Bank of North Dakota." Aside from Davidson, the fact of the deposit was not known to other members of the city commission until a time subsequent thereto; and certainly was not officially known to the city commission until after May 20th, 1923. Neither Davidson nor Craven pretended, even, to be acting in behalf of the city commission at the conference held or at any other time while the negotiations between the Bank of North Dakota, the depositors' guaranty fund commission and the Williston State Bank were in progress. Davidson testified he was acting in his own interest and in the interest of his bank, as the closing of this bank would, in his opinion, probably involve his bank. Craven testified that, acting as a citizen and at the request of others he had endeavored to devise means to save the bank. The treasurer, it is true, agreed to and did deliver to the representative of the Bank of North Dakota and the depositors' guaranty fund commission the deed and assignment of the rents. It is immaterial, in our opinion, whether he received or did not receive other security. The record does not show that the city commission authorized these officials to act for the city in the manner they did act, or to make any promises, representations or declarations concerning said illegal deposit, or the substitution of securities, nor that the city commission in any manner ratified their acts; on the contrary, the evidence shows conclusively that no such authorization *Page 820 
was made, and that there was no ratification of the acts of these officials by the board of city commissioners. City commissioners are elected at large by the electors of the city and form the board of city commissioners. This board, when duly assembled as such, has the right to exercise the powers conferred by the legislature upon cities organized under the commission form of city government.
No single commissioner nor group of commissioners acting as individuals or as a group, but not regularly assembled as the board of city commissioners, has authority or power to bind the municipality by his actions, representations or declarations, unless authority to do so is actually or ostensibly conferred upon him or them by the Board of City Commissioners. Said Justice Brewer: ". . . Nor is this merely an arbitrary rule, but one founded upon the clearest dictates of reason. Wherever a matter calls for the exercise of deliberation and judgment, it is right that all parties and interests to be affected by the result should have the benefit of the counsel and judgment of all the persons to whom has been intrusted the decision. It may be that all will not concur in the conclusion; but the information and counsel of each may well affect and modify the final judgment of the body. Were the rule otherwise, it might often happen that the very one whose judgment should and would carry the most weight, either by reason of his greater knowledge and experience concerning the special matter, by his riper wisdom and better judgment, or by his greater familiarity with the wishes and necessities of those specially to be affected, or from any other reason, and who was both able and willing to attend, is through lack of notice an absentee. All the benefit, in short, which can flow from the mutual consultation, the experience and knowledge, the wisdom and judgment of each and all the members, is endangered by any other rule." Paola F. River R. Co. v. Anderson County, 16 Kan. 302; State ex rel. Lemke v. Union Light, Heat P. Co. 47 N.D. 402, 182 N.W. 539; State ex rel. Lemke v. Chicago N.W.R. Co. 46 N.D. 313, 179 N.W. 378.
Peculiarly appropriate to the facts in this case is the following quotation from the opinion in Loff v. Gibbert, 39 N.D. 181, 166 N.W. 810: "An equitable estoppel arises when one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe *Page 821 
certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. 16 Cyc. 722, 723. Such estoppel is said to arise when, in good conscience and honest dealing, a party ought not to be permitted to gainsay a fact asserted by him. Ridgway v. Morrison, 28 Ind. 203. The doctrine of estoppel is derived from the courts of equity, and is interposed to prevent injustice and to guard against fraud. `It will be allowed to shut out the truth only where necessary to do justice, and never where it would itself operate as a fraud or work injustice.' 16 Cyc. 724, 725. To constitute an equitable estoppel, `there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts, and the party to whom it was made must have been without knowledge or the means of knowledge of the real facts.' 16 Cyc. 726.
"`There can be no equitable estoppel short of one arising from actual contract, where the truth is known to both parties or where they both have equal means of knowledge.' 16 Cyc. 471."
The facts with reference to the deposit were accessible to the appellant. That the money deposited was public funds, was known to appellant's officials and agents having the negotiation of the proposed loan in charge. It knew the securities taken by the city treasurer became the property of the city. It knew, or ought to have known, the city treasurer had no authority to convey those securities without express authority from the board of city commissioners acting as such. The authority of the city treasurer is limited by law. No estoppel as applied to a municipality can grow out of dealings with public officers of limited authority where such authority has been exceeded, 10 R.C.L. 705; nor by the unauthorized or wrongful acts of its officers or agents, 10 R.C.L. 708; for all persons dealing with them are bound to know the extent and limitations of their powers and authority. New Haven v. Weston, 87 Vt. 7, 46 L.R.A.(N.S.) 921, 86 A. 996; Clark v. Des Moines, 19 Iowa, 199, 87 Am. Dec. 423; State v. Merchants Nat. Bank, 145 Minn. 322, 177 N.W. 135; Ramsey County v. Nelson, 51 Minn. 79, 38 Am. St. Rep. 492, 52 N.W. 991; 40 Cyc. 256, 259; Humboldt v. Schoen, 168 Wis. 414, 170 N.W. 250. Proof of an estoppel must be clear, and will not be created by *Page 822 
inference. Security State Bank v. Wernick, 51 N.D. 219,199 N.W. 948.
The mere delivery to the Bank of North Dakota by the city treasurer of the deed executed and delivered to him by the Williston Bank would not constitute a release of his, or the city's, claim of lien upon the property therein described and conveyed, nor operate as a conveyance of his or the city's rights and interests therein. Comp. Laws 1913, § 5511. Nor could this act under the facts in this case form the basis of an estoppel of the city. Generally an estoppel does not arise where the condition of the title to real estate is known to both parties, or both have the same means of ascertaining the truth. Loff v. Gibbert, supra; Oklahoma v. Texas, 268 U.S. 252, 69 L. ed. 937, 45 Sup. Ct. Rep. 497.
Nor can the fact that the citizens of the municipality made representations or admissions or remained silent concerning these transactions have any effect or tend in any manner to create an estoppel of the municipality to assert its rights, for such is the nature of a municipal corporation that it can act and be recognized and identified only by means of its human agencies, in this case the board of city commissioners. 19 R.C.L. 1139; Dill. Mun. Corp. 5th ed. § 1677; Ray v. Huntington, 81 W. Va. 607, L.R.A. 1918D, 931, 95 S.E. 23.
It follows that upon this phase of the case the findings of the trial court are in accord with the facts and the law applicable thereto.
Appellant directs attention to the fact that plaintiff has other security for its money, in that the treasurer gave a bond for $50,000, to the city, and that it covers such a transaction as we have here. When it is borne in mind that this action is one to determine priorities and establish the city's rights in so far as these securities alone are concerned, and is not an action for the marshaling of the securities, or for any other or further relief, this contention of the appellant must fall. We must remain within the bounds which the parties by their pleadings, evidence and theories on the trial of the case have set for us.
The manager and agents of the Bank of North Dakota, throughout this transaction, acted in entire good faith. There was a definite understanding between the Williston Bank and the manager and agents of the Bank of North Dakota, prior to the conveyance as security for the city's money, that the bank's city real estate should constitute a *Page 823 
part of the security for the loan then contemplated, and it was understood that the loan would be made only on the condition that said property be held available as such security. The Bank of North Dakota, therefore, in so far as said city real estate is concerned, occupies the position of a mortgagee, subsequent to the rights of the city in and to said city real estate.
Upon consideration of the whole record, we believe the findings of the trial court, in so far as they are essential to a correct disposition of the case, are amply supported by the evidence and should not be disturbed. The judgment in this action, however, must be without prejudice to the rights, if any, the Bank of North Dakota may have to compel a marshaling of the securities held by the city, including the liability to it of the sureties in the treasurer's bond. As so modified, the judgment in this case is affirmed.
BIRDZELL, BURKE, and NUESSLE, JJ., concur.
JOHNSON, J., dissents.
CHRISTIANSON, Ch. J., disqualified, did not participate; Honorable THOS. H. PUGH, Judge of the Sixth Judicial District, sitting in his stead, by request.