**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a Pennsylvania corporation, Plaintiff,**

v.

**DAKOTA TRACTOR AND EQUIPMENT COMPANY OF FARGO, NORTH DAKOTA, a North Dakota corporation, Defendant.**

Civ. No. 3921.

United States District Court
D. North Dakota,
Southeastern Division.
Oct. 28, 1964.

Russell R. Mather and Thomas A. Mayer, of Fleck, Smith, Mather & Strutz, Bismarck, N. D., for plaintiff.

E. T. Conmy, Jr., and Charles A. Feste, of Conmy, Conmy & Feste, Fargo, N. D., for defendant.

RONALD N. DAVIES, District Judge.

This action was commenced by American Casualty Company of Reading, Pennsylvania, a Pennsylvania corporation, against Dakota Tractor and Equipment company of Fargo, North Dakota, a North Dakota corporation. Jurisdiction is based upon diversity of citizenship and the requisite amount in controversy. American Casualty here seeks to recover on two indemnity agreements executed by Dakota Tractor by which that corporation agreed to indemnify American Casualty against loss suffered as surety on two road construction contract bonds. The case was tried to the Court without jury.

The credible evidence and the reasonable inferences to be drawn therefrom show that sometime in early April, 1958, James Coghlan, a road contractor of Minot, North Dakota, approached F. A. McDonna of Bismarck, an agent of the Plaintiff, to arrange for necessary bonds on road construction contracts that might be awarded by the State of North Dakota to him. Coghlan was advised that to meet the Plaintiff's bonding qualifications, the bonds would have to be secured by indemnity agreements.

The evidence shows that thereafter, but prior to April 25th, 1958, and pursuant to a prearranged appointment, McDonna visited the offices of Dakota Tractor, a family owned corporation of which John McWethy, Sr., was president and majority stockholder, John McWethy, Jr., was vice-president and treasurer, and the latter's brother, Otto McWethy, was secretary. These three family officers also comprised Dakota Tractor's board of directors. Dakota Tractor had twice previously acted as indemnitor for Coghlan on bonds and upon one occasion had guaranteed Coghlan's note to a bank. Present at the meeting were McWethy, Sr., McWethy, Jr., and McDonna; but according to the evidence, shortly after the subject of bonds and indemnity agreements was raised, McWethy, Sr., left the immediate area of the meeting.

During the course of the ensuing conversation McWethy, Jr., told McDonna that Coghlan was indebted to Dakota Tractor and he expressed his belief that Coghlan was in a position to make some money with a little assistance, and that Dakota Tractor would like to help if it could. An agreement was reached that Dakota Tractor would act as indemnitors on the construction bonds if the indemnity agreements were made specific to apply only to the contracts that Coghlan was bidding on in North Dakota.

McDonna returned to Bismarck where two indemnity agreements were prepared, referring specifically to two projects, one in McLean County and the other in Dunn County, North Dakota. The agreements were then mailed to John McWethy, Jr., on April 25, 1958. On April 28, 1958, the agreements were returned to McDonna, signed by Otto McWethy as secretary of Dakota Tractor, witnessed by John McWethy, Jr., as vice-president and treasurer, and bearing the imprint of the corporate seal.[1] At this time the agreements had not been signed by Coghlan nor had Otto McWethy's signature as secretary of the corporation been notarized as required by the instruments.

On May 23, 1958, McDonna again sent the agreements to McWethy, Jr., requesting that they be completed. Precisely how or when the agreements came back into McDonna's possession was not clearly disclosed, but the documents themselves clearly indicate that they were completed and notarized on June 3, 1958.[2] On that same day American Casualty executed two contract bonds with Coghlan as principal and itself as surety, binding itself to the State of North Dakota and to any person having a claim for labor, supplies and materials used in completion of two road construction projects located in McLean and Dunn Counties, North Dakota, which were the same two projects designated in the indemnity agreements.

On June 10, 1958, in order to secure working capital and to cover a prior loan, Coghlan assigned $60,000.00 of earnings due or to become due on the Dunn County contract to the First National Bank of Minot, North Dakota. Consent of surety was executed on behalf of American Casualty by McDonna. On October 27, 1958, a second assignment was made by Coghlan to the bank of all monies due or to become due on the Dunn County contract. This time the consent of surety

1. Although the testimony was confusing as to just when the agreements were executed or whether they were both handled in the same manner, the Court believes from the testimony this is the manner in which the agreements were handled.

2. Even if McDonna had McWethy's signature notarized in a manner not prescribed by law as contended by the Defendant, it is conceded that the signature was in fact that of Otto McWethy and that he did execute the agreements.

was executed by William F. Froehlich of Froehlich-Paulson-Moore, Inc., Grand Forks, North Dakota, General Agents for American Casualty in North Dakota.

On February 13, 1959, John McWethy, Sr., secured an assignment from Coghlan to Dakota Tractor of $22,000.00, which amount was believed to be the final payment due on the McLean County contract. After discussing Coghlan's financial situation with John McWethy, Sr., Thomas K. Mount, assistant secretary of American Casualty, on March 5, 1959, executed the consent of surety to the assignment. The funds from the assignment were to be used by Dakota Tractor, first, to pay any lienable claims against the project and, second, to hold any balance for Coghlan's account to enable him to have sufficient working capital to resume operations on the Dunn County project.

On March 26th, 1959, after learning that the final payment on the McLean County project was only $5,600.00 instead of the anticipated $22,000.00 and that there then existed over $100,000.00 in lienable charges, John McWethy, Sr., requested Thomas K. Mount to have the October 27th assignment to the bank set aside and requested all future payments on the Dunn County contract be made to the surety to insure that all lienable charges would first be paid. In compliance with this request Froehlich together with McWethy, Jr., on April 2nd, 1959, arranged for Coghlan to execute two assignments, one of $41,000.00 to the bank in substitution of the October 27th assignment, and the other, subject to the banks, to Froehlich-Paulson-Moore, Inc., of all monies due or to become due on the Dunn County contract. An account was opened in the Red River National Bank of Grand Forks in the name of Froehlich-Paulson-Moore, Inc., entitled "special account." Earnings were then deposited in this account from the Dunn County contract and provision made for Froehlich to draw checks on this account payable to those of Coghlan's creditors designated by Dakota Tractor. All checks were to be countersigned by V. L. Towne,

an employee of Dakota Tractor, and were mailed in envelopes bearing the return address of Froehlich-Paulson-Moore, Inc., and containing a covering letter signed by Froehlich. These steps were taken, according to the evidence, to prevent creditors of Coghlan from becoming aware of Dakota Tractor's involvement.

Sometime prior to the foregoing arrangements, Edwin Lindteigen, a subcontractor of Coghlan's, had been pressing for payment of monies due him and had declined execution of a "pit" release to the State of North Dakota until paid. Since the release was necessary before the State of North Dakota would make estimated payments on the Dunn County project, on April 3rd, 1959, McDonna arranged for a loan of $25,000.00 to Lindteigen from the Dakota National Bank of Bismarck, North Dakota. The note was guaranteed by American Casualty and by Dakota Tractor and was subsequently paid from the assigned earnings in the special account referred to. Other materialmen and subcontractors, on the two projects were paid from the special account, but it soon developed there would be insufficient funds to pay all lienable claims. In November of 1959 the first of many legal actions was commenced against Coghlan as principal and American Casualty as surety on the contract bonds.

On November 30th, 1959, American Casualty notified Dakota Tractor of the pending action and advised them that American Casualty would look to Dakota Tractor for indemnity under the terms of the indemnity agreements for any losses sustained under the contract bonds. This notice was acknowledged by McWethy, Jr., on December 4, 1959, and he then requested that as "we did not receive copies of the bonds (sic) which we signed and were under the impression there were only two. Would, you therefore, please send us copies of the ones we signed?"

After having paid all claims for labor, supplies and materials under the terms of the bonds on both the McLean and

Dunn County contracts, American Casualty commenced this action against Dakota Tractor as indemnitors.

Relying on Section 10–0107, North Dakota Revised Code of 1943 [3] which reads as follows:

"General Powers; Restriction. Every corporation, as such, has power:

\* \* \* \* \* \*

"(8) To enter into any obligations or contracts essential to the transaction of its ordinary affairs, or for the purposes of the corporation."

"No corporation shall possess or exercise any corporate powers except those enumerated in this section, those otherwise expressly given to it by law, and those which are necessary to the exercise of such powers."

it is the Defendant's principal contention that the indemnity contracts are void because they are *ultra vires* in that it is not *essential* to the transaction of the ordinary affairs of the corporation for it to execute indemnity agreements.

 The law is now well settled that in all grants of corporate powers there exists not only the powers expressly granted but also such implied powers as are necessary or reasonably appropriate to the exercise of those powers expressly granted, and an *ultra vires* act is the exercise of a power not within the express or implied powers of the corporation.

 While it is not ordinarily necessary in the conduct of a corporation's business to lend its credit to another business, the power to act as surety or guarantor exists whenever it is reasonbly necessary in the conduct of its business. Fletcher, Cyclopedia of Private Corporations, Volume 6, Section 2591 (1950 Ed.). This doctrine of implied powers permitted Dakota Tractor to enter into the indemnity contracts since it could reasonably be expected that as a result thereof there would be an increase in Dakota

Tractor's business through the sale of parts and equipment to Coghlan and his payment of a pre-existing debt.

 The contention that the indemnity agreements were not *essential* to the transaction of Dakota Tractor's ordinary affairs this Court must reject. "The general rule is that *ultra vires* transactions, not *mala in se* nor *mala prohibita*, are recognized as unassailable and are permitted to stand as the foundation of rights acquired under them after they have been fully performed on both sides. \* \* \* " City of Williston v. Ludowese, 53 N.D. 797, 208 N.W. 82, which quotes with approval from Clarke v. Olson, 9 N.D. 364, 83 N.W. 519, to this effect:

" 'It is well settled that a corporation cannot avail itself of the defense of ultra vires when the contract in question has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract. Much less will the claim that the transaction was ultra vires be allowed as a ground for rescinding the contract, and restoring to the complaining party, on that ground, the property or funds with which he has parted, after he has had the benefit of full performance of the contract by the other party; and, *in general, the plea of ultra vires will not be allowed to prevail, whether interposed for or against a corporation, when it will not advance justice, but, on the contrary, will accomplish a legal wrong.*" (Citing cases.) "Where it is a simple question of capacity or authority to contract, arising either on a question of regularity of organization or of power conferred by the charter, a party who has had the benefit of the agreement canont be permitted, in an action founded on it, to question its validity. It would be in the highest degree inequitable and unjust to permit the defendant to repudiate

---

3. The statute in effect at the time the indemnity agreements were executed.

a contract, the fruits of which he retains." * * * ' " (Emphasis mine.)

The Defendant's contention that the execution of the indemnity agreements was never authorized, consented to by the board of directors nor ratified and is, therefore, unenforceable, is, in the opinion of this Court, without any substance. It is not necessary in order to bind a corporation that all acts done by its officers should be specifically authorized by the board of directors and such authorization entered in its books. It is recognized that officers and directors of a closed corporation which is the case here, frequently act informally, but nevertheless have authority to bind the corporation. In re B–F Building Corporation, 6 Cir., 284 F.2d 679.

Moreover, the unauthorized acts of an officer of a corporation may be ratified by the corporation by conduct implying approval and adoption of the act in question. Such ratification may be express or may be inferred from silence and inaction. If the corporation, after having full knowledge of the unauthorized act, does not disavow the agency and disaffirm the transaction within a reasonable time, it will be deemed to have ratified it. Dakota Tractor beyond question executed the two indemnity agreements in question by and through its duly authorized corporate officers, and assuredly by its subsequent conduct ratified them.

The contention of Dakota Tractor that the indemnity agreements were procured by fraud is not only without foundation but is without any support whatever in the record before this Court. Plaintiff having met the burden of proof imposed upon it and having established by a clear preponderance of the credible evidence that it suffered losses in the sum of $88,729.84 under the terms of the two contract bonds, is entitled to judgment against the Defendant for that sum together with interest provided by law under the terms of the indemnity agreements.

This Memorandum Opinion is considered compliance with Rule 52(a), F.R. Civ.P., 28 U.S.C.A.

Form of judgment will be prepared by counsel for the Plaintiff and transmitted to the Clerk of this Court at Fargo.